THE STATE, EX REL. KEEFE, *v.* EYRICH ET AL.

[Cite as State, ex rel. Keefe, *v.* Eyrich (1986), 22 Ohio St. 3d 164.]

(No. 85-1680—Decided January 31, 1986.)

*Spraul, Reyering & Cronin, Daniel G. Spraul, Thomas C. Spraul, Patrick J. Cronin, William H. Reyering, Stephen G. Spraul, Waite, Schneider, Bayless & Chesley, Stanley M. Chesley* and *Thomas W. Keefe,* for relator.

*Arthur M. Ney, Jr.,* prosecuting attorney, and *James W. Harper,* for respondent Hamilton County Board of Elections.

*Anthony J. Celebrezze, Jr.,* attorney general, *Andrew I. Sutter* and *Cherry Lynne Poteet,* for respondent Secretary of State.

*Albert L. Bell,* urging denial of the writ for *amicus curiae,* Ohio State Bar Association.

*Per Curiam.* This case presents a question of great significance to constitutional government in Ohio. We are called upon to decide whether a section of Ohio's Modern Courts Amendment, passed by the voters in

1968, can stand under a federal constitutional challenge. For reasons to follow, we conclude that it can.

At the outset, we must decide what standard is appropriate for our review of the constitutional issue now before us. We begin by noting that there is no fundamental right to run for public office. This concept was explained by the United States Supreme Court in *Snowden* v. *Hughes* (1944), 321 U.S. 1, at 6-7:

"The protection extended to citizens of the United States by the privileges and immunities clause includes those rights and privileges which, under the laws and Constitution of the United States, are incident to citizenship of the United States, but does not include rights pertaining to state citizenship and derived solely from the relationship of the citizen and his state established by state law. * * * [Citations omitted.] The right to become a candidate for state office, like the right to vote for the election of state officers * * * [citations omitted], is a right or privilege of state citizenship, not of national citizenship which alone is protected by the privileges and immunities clause."

Because Section 6(C), Article IV of the Ohio Constitution does make a distinction between those under age seventy and those over age seventy concerning their eligibility to run for judicial office, an issue is apparent involving the Equal Protection Clause of the Fourteenth Amendment.

In two cases, the United States Supreme Court has addressed equal protection challenges to mandatory retirement statutes. In the first, *Massachusetts Bd. of Retirement* v. *Murgia* (1976), 427 U.S. 307, the court upheld a state law requiring uniformed state police officers to retire at age fifty. The court observed at 313 that the right to government employment is not *per se* fundamental, and that those persons past the mandatory retirement age do not "constitute a suspect class for purposes of equal protection analysis." Consequently, the court refused to employ a strict scrutiny standard of analysis. *Id.* at 314. Instead, the state's mandatory retirement statute was subjected to a rational basis gauge of inquiry, beginning with the proposition that acts of a state legislature are presumed valid, *id.*, and concluding with the principle that the legislation will be upheld if its purposes serve some legitimate state interest.

The second mandatory retirement decision is *Vance* v. *Bradley* (1979), 440 U.S. 93. Under attack was a federal law requiring foreign service officers to retire at sixty years of age. In sustaining the statute, the court again refused the invitation to classify mandatory retirees as a suspect class, and declined to apply a compelling governmental interest standard of review. The court said at 97: "[W]e will not overturn such a [mandatory retirement] statute unless the varying treatment of different groups is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational."

We believe the standards set forth in *Murgia* and *Vance* are applicable to the mandatory retirement requirement of Section 6(C), Article IV of

the Ohio Constitution. Further, because the Modern Courts Amendment, of which the disputed provision is a part, was passed by the vote of the people of Ohio, we are constrained to give it the greatest possible deference. We therefore will sustain it, in the face of this challenge, if it bears any relationship to a legitimate state interest.

The respondents, in defining the state's concerns in maintaining the judicial age proscription, rely on *Malmed* v. *Thornburgh* (C.A.3, 1980), 621 F. 2d 565. That case sets forth four reasons in support of the ban: (1) that retired judges furnish a pool of judicial manpower to help ease court congestion, while younger judges are provided a means to move into the system, (2) that mandatory retirement eliminates the unpleasantness of selectively removing senile judges, (3) that mandatory retirement prevents harm to the justice system by senile judges who can " 'undo the efforts of a hundred excellent Judges' " (*id.* at 572), and (4) that mandatory retirement conforms to the recommendations of bar associations and other groups, and corresponds with the trend in other public and private employment.

First, we agree that a substantial public interest exists in reducing the delays to the administration of justice caused by overcrowded dockets. Retired judges provide a resource of experienced jurists to help manage the staggering workload that looms in some parts of Ohio. Additionally, mandatory retirement allows younger judges to move into the system, promoting new life and vigor to the judiciary, while at the same time giving these new members essential experience in their work.

Second, the citizens of the state have a right to expect that the process of removing intellectually deficient jurists will not evolve into the embarrassing spectacle of having the aged, infirm, or senile judge forcibly removed from the bench. This, to us, seems to be an obvious concern.

Third, it warrants no lengthy discussion to realize the self-evident consideration that unfit judges do harm to the judicial system. A mentally incompetent jurist costs litigants both time and money. They are forced to work under conditions which hinder the fair and prompt resolutions of their disputes, and are further inconvenienced by having to resort to removal proceedings or the appellate process to remedy any resulting wrongs done them.

Fourth, we take notice that mandatory retirement is becoming more popular with both the public and private sectors. It is becoming increasingly recognized that efficiency and fitness are important considerations in any field of endeavor. We do not feel that the citizens of Ohio should be expected to settle for any less, particularly since it is they who bear the expenses of maintaining our court system.

In view of the fact that there exists no fundamental right to be a candidate for public office, we simply cannot say that the reasons given by respondents for mandatory retirement of judges are so irrational that they do not correspond with legitimate interests of the people of Ohio. Conse-

quently, we do not find, under this rational basis standard, that Section 6(C), Article IV of the Ohio Constitution is invalid.[1] We believe that it passes muster when measured against the United States Constitution.

We now consider whether a writ of mandamus should issue to compel the respondents to place relator's name on the primary election ballot for this year.

The familiar criteria for mandamus are (1) that the relator has a clear legal right to the relief prayed for, (2) that the respondents have a clear legal duty to perform the requested acts, and (3) that the relator has no plain and adequate remedy in the ordinary course of the law. *State, ex rel. Westchester,* v. *Bacon* (1980), 61 Ohio St. 2d 42 [15 O.O.3d 53], paragraph one of the syllabus.

Since we find Section 6C), Article IV of the Ohio Constitution to be valid, we conclude that the relator can establish no clear legal right to the relief he seeks. It follows, then, that respondents are under no duty whatsoever to certify his name for placement on the May 6 primary election ballot. The writ is therefore denied.

*Writ denied.*

LOCHER, HOLMES, C. BROWN, DOUGLAS and WRIGHT, JJ., concur.

CELEBREZZE, C.J., and SWEENEY, J., dissent.

LOCHER, J., concurring. Although I applaud Judge Keefe's exemplary career and dedication to the highest ideals of the judiciary, and am confident that Judge Keefe's ability will be recognized through assignment after his retirement, I am compelled to support the majority opinion herein.

As age seventy inexorably overtakes a sitting judge, the process inescapably causes the jurist to wonder, to ask, to introspect and to sense a vague disquiet. During this process the judge feels demeaned, ever so slightly, in the thought that society is no longer concerned with the sacrifices the judge has made for it.

These concerns should not trouble relator because they are totally irrevelant to him, his vitality and his dedication. The devotion is unquestionably present.

This court takes full judicial notice that Judge John W. Keefe's career is replete with industry, honesty, fairness and ability.

---

[1] We realize, of course, that because judges elected and holding office before age seventy may continue to serve until the expiration of their terms, some inequities do exist under Ohio's mandatory retirement provision. However, "[p]erfection in making the necessary classifications is neither possible nor necessary." *Murgia, supra,* at 314. In addition, "[w]here [as here] rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.' " *Id.* at 316.

Indeed, it is my fervent hope that Judge Keefe will serve for many more years by assignment and thereby further his already significant impact upon Ohio's judicial values. Ohio cares, and I care, that the sacrifices and dedication of its senior judges will be remembered, and the wealth of talent and experience will not go unrewarded and unnoticed.

HOLMES, J., concurring. While I am in basic agreement with the majority opinion, I write separately to express other reasons for denial of the writ.

As preface to my commentary upon the merits of this case, I submit that there can be little or no doubt about the present capability of this particular relator to carry out the highest standards of judicial functioning, or his ability to continue to do so for some indefinite period of time. In like manner, this legal issue, presented to us in the form of a question of the constitutionality of an amendment to the Ohio Constitution mandated by the electorate, does not place in contest the professional capability of many other Ohio judges who have arrived at the age of seventy and who are presently serving or wish to continue to serve. This original action directly questions the right of the citizens of Ohio to determine, by way of constitutional amendment, the desired manner of providing for their own judicial system and for those who function within it. It would seem to be clear that, short of infringement of the individual constitutional rights protected by the United States Constitution, our citizens in Ohio may rationally provide for their own well thought out judicial system, inclusive of the judiciary serving such system.

The Constitution of Ohio provides for the retirement of Ohio's judges after age seventy by forbidding them the right to be reelected "if on or before the day when he shall assume the office * * * he shall have attained the age of seventy years. * * *" Section 6(C), Article IV of the Ohio Constitution. Ohio is hardly unique in this requirement since most other states have similarly restricted access to their judicial offices. See, e.g., *Boughton* v. *Price* (1950), 70 Idaho 243, 215 P. 2d 286; *Trafelet* v. *Thompson* (C.A. 7, 1979), 594 F. 2d 623 (Illinois); *O'Neil* v. *Baine* (Mo. 1978), 568 S.W. 2d 761; *Grinnell* v. *State* (1981), 121 N.H. 823, 435 A. 2d 523; *Maresca* v. *Cuomo* (1984), 64 N.Y. 2d 242, 485 N.Y. Supp. 2d 724, 475 N.E. 2d 95; *Rubino* v. *Ghezzi* (C.A. 2, 1975), 512 F. 2d 431 (New York); *Malmed* v. *Thornburgh* (C.A. 3, 1980), 621 F. 2d 565 (Pennsylvania); *Nelson* v. *Miller* (1971), 25 Utah 277, 480 P. 2d 467; *Aronstam* v. *Cashman* (1974), 132 Vt. 538, 325 A. 2d 361.

It must not be forgotten that the restriction at issue is not a mere statute, but is a fully valid and effective component of the Ohio Constitution. It was passed by over sixty percent of the voting electorate. Such an amendment is co-equal with those provisions which established and empowered this court. We have long held that even if the state's constitutional provision is unjust, it may neither be disregarded nor construed

away. The remedy, within the framework of state government, "must be found in the action of the people themselves, through an amendment of their work * * *." *Hockett* v. *State Liquor Licensing Bd.* (1915), 91 Ohio St. 176, 195. Such changes in a state's constitution which affect a co-equal branch of state government ought to be brought about slowly, over an extended period of time, attendant with deliberations and after considering the interests of all the state's people. It is most unwise to allow quick remedies through the judiciary since these invariably focus on the narrow interests of a particular party.

Further, while age discrimination may be abhorrent under the federal Constitution for some purposes, especially when applied broadly, it is a permissible basis upon which states and private employers may constitutionally mandate retirement for specific kinds of employment. See, *e.g.,* *Massachusetts Bd. of Retirement* v. *Murgia* (1976), 427 U.S. 307; and *Vance* v. *Bradley* (1979), 440 U.S. 93. Consequently, all that is required is that the state demonstrate a rational basis to believe that the use of age will obtain a legitimate state goal.

Relator, however, asserts that the use of age to restrict his access to the ballot is a denial of his right to equal protection and a state infringement upon his right to vote (for himself). Obviously contemplated herein is the right of all Ohio voters to vote for relator. Accordingly, relator asserts that such an impact of this law must be measured by strict scrutiny, the focus of which is whether the law is strictly necessary to achieve a compelling state interest. *American Party of Texas* v. *White* (1974), 415 U.S. 767. The thrust of relator's argument is that his case involves an infringement on the right to vote and access to the ballot. See *Bullock* v. *Carter* (1972), 405 U.S. 134; *Lubin* v. *Panish* (1974), 415 U.S. 709; *Communist Party of Indiana* v. *Whitcomb* (1974), 414 U.S. 441; *Illinois State Bd. of Elections* v. *Socialist Workers Party* (1979), 440 U.S. 173. Furthermore, it is necessarily different from all the mandatory retirement cases cited above and that age, in this context, is a suspect classification. See, *e.g., Graham* v. *Richardson* (1971), 403 U.S. 365; *McLaughlin* v. *Florida* (1964), 379 U.S. 184; *Oyama* v. *California* (1948), 332 U.S. 633.

The mere fact that relator seeks to place his name on the ballot does not bring him within the ambit of the above cases. Most of the above ballot access cases overturned statutes which impeded access to the ballot. Such statutes invidiously excluded minority representation and thereby undermined the democratic process. Moreover, the classes affected were those of insular political views, such as Socialists and Communists, or were insular minorities, *i.e.,* indigent Hispanics and Blacks. We note that such discrimination against these classes of persons was invariably suspect. Furthermore, in those cases not involving classification, the requirement which limited the access of candidates to the ballot was found to be necessary. See, *e.g., Lubin, supra,* at 709.

None of the above problems are present in Ohio's Constitution. The

use of age to determine an appropriate point of retirement does not vary depending on whether the employment results from the election by voters. The thrust of the amendment also differs in that it is aimed at retirement, not the electoral process. The effect on elections in general, and ballots in particular, is therefore incidental. Finally, far from removing a particular candidate from consideration by the electorate, this constitutional amendment was submitted to the electorate and won overwhelmingly.

It was also asserted that because Ohio's system for the election of judges is different from those states which have passed on the issue *sub judice,* the result in this case should not turn on those cases. It is pointed out that some states do not have competitive elections, while still others mandate immediate retirement at age seventy. However, the first is a veiled assertion that there is a constitutional requirement of competitive elections and it might just as usefully be argued that such a merit system impermissibly removes candidates from voter consideration. Ohio's law is, in fact, most similar in that it seeks, through Ohio's Constitution, to regulate the quality of Ohio's judges who seek reelection. The second difference is also one without any distinction, since it implies an admission that forced retirement at age seventy is constitutionally permissible. Such provisions are in fact drawn *more strictly* than Ohio's, which allows judges to retain their office for the remainder of their elective term. See *Malmed* v. *Thornburgh, supra.*

An analysis of the amendment at issue reveals that it not only provides for the retirement of judges, but for their re-appointment as well. The restriction therefore results in an increase of judicial manpower by bringing in younger judges, while retaining the services of willing and able retired judges. It permits the orderly attrition of judges and promotes the advancement of general considerations of judicial efficiency. This insures the fitness of the judiciary as a whole and provides a judicial system of the highest caliber. See, *e.g.,* Annotation (1977), 81 A.L.R. 3d 811. Furthermore, the use of a private action, which is available in Ohio, to remove disabled judges selectively is not only distasteful to local judiciaries and trial counsel, but is also an embarrassing stigmatization of the judge whose competence is challenged. Consequently, the procedures established by the amendment fulfill rational needs within this state.

Age, under the circumstances of the case here, is a reasonable classification, useful for the accomplishment of the state's legitimate objective of providing a fully competent judiciary. Ohio's constitutional provision is therefore directly within the ambit of those cases requiring retirement for a particular, narrowly drawn, public office.

CLIFFORD F. BROWN, J., concurring. I concur in the analysis and result of today's decision. I regret, however, the loss of such a physically and mentally vigorous and capable jurist as relator, whose continued service would have greatly benefited the people of this state.

The issue of the constitutional validity of Section 6(C), Article IV of the Ohio Constitution is one of first impression in Ohio. However, the present posture of legal precedent in Ohio and in other state jurisdictions, as well as in the federal system, compels the upholding of this provision, denying relator the writ he seeks.

This case presents a very debatable legal issue. Today we deny relator's claim of his right to be on the ballot as a judicial candidate on the basis that the age-seventy Ohio constitutional provision does not violate the equal protection or other provisions of the Fourteenth Amendment to the United States Constitution. The United States Supreme Court has not yet spoken on this exact issue. A flexible view and rationale could well guide a court to a conclusion that Section 6(C), Article IV of the Ohio Constitution violates the Fourteenth Amendment to the United States Constitution.

*Malmed* v. *Thornburgh* (C.A. 3, 1980), 621 F. 2d 565; *Rubino* v. *Ghezzi* (C.A. 2, 1975), 512 F. 2d 431; and *Trafelet* v. *Thompson* (C.A. 7, 1979), 594 F. 2d 623, which upheld similar mandatory retirement provisions in the state Constitutions of Pennsylvania, New York, and Illinois, are decisions of three circuits of the United States Courts of Appeals and are not binding on our court or on the United States Supreme Court. Neither are state supreme court decisions of Idaho, Louisiana, Missouri, New Hampshire, New York, Utah or Vermont binding on our court or on the United States Supreme Court.

The United States Supreme Court has handed down a line of decisions which I believe at least arguably imply that the age-seventy provision at bar offends the federal Constitution. These cases involve the right to vote and the right of access to the ballot, and appear to be sufficiently analogous to the case at bar to warrant discussion.

In *Bullock* v. *Carter* (1972), 405 U.S. 134, the court examined a Texas statutory scheme requiring candidates for local office to pay filing fees as high as $8,900 as a condition to having their names placed on the ballot in a primary election. In determining what standard is appropriate for reviewing barriers to candidate access to the ballot, the court noted that "[t]he existence of such barriers does not of itself compel close scrutiny." *Id.* at 143. "In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." *Id.* The *Bullock* court considered the filing fee requirement therein to be "patently exclusionary," precluding some candidates from the ballot no matter how qualified and no matter how broad or enthusiastic their popular support. Thus, the effect on voters was neither incidental nor remote. *Id.* at 143-144. The court concluded that these factors called for the use of the "strict scrutiny" standard, under which the limitation must be shown to be *necessary,* not merely rational. *Id.* at 147.

A credible argument could be made that the age-seventy limitation in the instant cause is analogous to the filing fee requirement in *Bullock.* It,

too, may be reviewed as "patently exclusionary" in that all judicial candidates over a certain age, no matter how qualified and no matter how broad or enthusiastic their popular support, are excluded from the ballot. Thus, the strict scrutiny standard may be called for, requiring the state to demonstrate that the limitation is necessary to achieve some compelling state interest.

A showing of necessity in this case would be difficult. The state interest herein is ostensibly to prevent candidates prone to senility or other infirmities from serving as judges. But the age-seventy limitation is not necessary to achieve this objective. R.C. 2701.11 and 2701.12 allow for the removal and forced retirement of judges for, among other reasons, "disability." See, also, Gov. Jud. R. II 5(b) and II 10(b).

Even if the age-seventy limitation were necessary for the achievement of some compelling state interest, it may still be constitutionally infirm. The United States Supreme Court has held that where a state intends to restrict access to the ballot, it must use the least drastic means to achieve that end. *Illinois State Bd. of Elections* v. *Socialist Workers Party* (1979), 440 U.S. 173, 185. In that case, the court reviewed an Illinois statutory scheme requiring new political parties and independent candidates to obtain the signatures of twenty-five thousand qualified voters in order to appear on the ballot in statewide elections. The court noted that "an election campaign is a means of disseminating ideas as well as attaining political office. * * * Overbroad restrictions on ballot access jeopardize this form of political expression." *Id.* at 186. It could be argued that the age-seventy limitation in the instant cause, in its attempt to exclude unfit candidates, does not employ "the least drastic means" to achieve that end. It is a blanket exclusion of *all* judicial candidates over a certain age, no matter how fit a particular candidate of that age may actually be.

In sum, it appears from the foregoing that a "patently exclusionary" state restriction on access to the ballot must be shown to be necessary to the achievement of a compelling state interest. *Bullock, supra.* See, also, *Williams* v. *Rhodes* (1968), 393 U.S. 23 [45 O.O. 2d 236] (striking down an Ohio statutory scheme requiring a new political party to obtain petitions signed by qualified electors totalling fifteen percent of the number of ballots cast in the last gubernatorial election as a prerequisite for a ballot position in presidential elections). Even if shown to be necessary, such restrictions must still employ the least drastic means to achieve their purpose. *Illinois State Bd. of Elections, supra.* See, also, *Lubin* v. *Panish* (1974), 415 U.S. 709, 716 (invalidating a state filing fee requirement which compels even indigents to pay the fee without providing reasonable alternative means of ballot access). It may be argued that the age-seventy limitation *sub judice* meets neither of these standards.

The age-seventy limitation may also impermissibly burden a second fundamental right: the right of voters to assert their political preferences at the polls. *Illinois State Bd. of Elections, supra,* at 184. Infringement of

this fundamental right also calls for a strict standard of review, under which the state must show that the infringement is necessary to advance a compelling state interest. See, *e.g., Harper* v. *Virginia Bd. of Elections* (1966), 383 U.S. 663 (striking down a Virginia constitutional provision conditioning the right to vote on the payment of a poll tax).

*Snowden* v. *Hughes* (1944), 321 U.S. 1, arguably can be distinguished from the instant cause. *Snowden* concerned the alleged erroneous application by members of the state primary canvassing board of the Illinois election laws, thereby depriving petitioner of the Republican nomination for state representative and of election to that office. The petitioner alleged that members of the canvassing board refused to file a true certificate of his nomination, depriving him of election as state representative in a state assembly. In support of its dismissal of the complaint, the United States Supreme Court stated, *inter alia*, "[t]here is no allegation of any facts tending to show that in refusing to certify petitioner as nominee, the Board was making *intentional or purposeful discrimination between persons or classes.* \* \* \*" (Emphasis added.) *Id.* at 7. "The unlawful administration by state officers of a state statute, fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection *unless* there is shown to be present in it an element of *intentional or purposeful discrimination.* \* \* \*" (Emphasis added.) *Id.* at 8. With reference to relator Keefe and his age *class*, there has been "intentional and purposeful discrimination."

Likewise, *Massachusetts Bd. of Retirement* v. *Murgia* (1976), 427 U.S. 307, is distinguishable. There, the court upheld a state law requiring uniformed state police officers to retire at age fifty, concluding at 317 that the state law "does not deny appellee equal protection of the laws." The court noted that the record included testimony of three physicians concerning the relationship between aging and ability *safely* to perform *police functions, id.* at 311, and then applied a rational basis test, stating: "Through mandatory retirement at age 50, the legislature seeks to *protect the public* by assuring *physical preparedness* of its uniformed police." *Id.* at 314. Unlike *Murgia*, there is no need to "protect the public by assuring physical preparedness" by barring relator Keefe and his age class from judicial office.

*Vance* v. *Bradley* (1979), 440 U.S. 93, held that the federal law requiring foreign service officers to retire at age sixty was constitutionally valid and did not violate the equal protection provision of the Fifth Amendment to the United States Constitution. *Vance* is also distinguishable. In upholding the mandatory retirement law therein, the *Vance* court emphasized the fact that the foreign service involves extended overseas duty under difficult and often hazardous conditions. However, the rationale in *Vance* supports the conclusion that a government is empowered to enact a law making retirement mandatory on the basis of age. Since Congress has the power to enact a law requiring foreign service officers to retire at age

sixty, the people of Ohio have the power to enact an amendment to the Ohio Constitution requiring judges to retire on the basis of age. This is so even though this result appears to collide with, and to reject, the holdings of the ballot-access decisions of the United States Supreme Court in *Bullock, Illinois State Bd. of Elections, Williams,* and *Lubin,* discussed *supra.*

The observation is made that Section 6(C), Article IV is authorized by Section 2, Article I of the Ohio Constitution which grants power to the people to "alter" or "abolish" any part of their state government as they deem necessary. This observation gives no consideration to whether Section 6(C) conflicts with the Equal Protection Clause of Section 2, Article I. Nor have we decided, or even considered, this or any other state constitutional issue in this case. The basic issue herein is whether Section 6(C) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. It does not violate the Fourteenth Amendment because of the rationale of the United States Supreme Court in a comparable situation in *Vance,* previously discussed, which applies to relator in the instant cause.

It is generally accepted that a court has power to declare a state constitutional provision unconstitutional because it violates a provision of the United States Constitution, or to uphold it because it does not. I note further that any observation concerning the constitutional validity of any possible future state constitutional amendment providing for the appointment of state court judges and abolishing their election is premature, and beyond the pale of the inquiry in this case.

It is evident from the foregoing that the case at bar presents a multitude of difficult constitutional questions as yet unresolved by this nation's highest court. I look forward with interest to the possibility of more specific guidance from that quarter.

DOUGLAS, J., concurring. I concur in the judgment as set forth in the *per curiam* opinion but write separately as my reasons for such judgment differ, in some respects, from those expressed in the majority opinion.

John W. Keefe, the relator, is a judge of the First District Court of Appeals. On October 2, 1985, Judge Keefe filed a declaration of candidacy and a petition to have his name placed on the primary election ballot for the May 6, 1986 election. Judge Keefe seeks to be a candidate for reelection to the office of Judge of the First District Court of Appeals.

It is undisputed that the petition filed by Judge Keefe was proper as to form and contained the requisite number of signatures. Notwithstanding the regularity of the petition, respondent Hamilton County Board of Elections refused to certify Judge Keefe's name for entry on the May 6, 1986 primary ballot. The sole reason for the refusal was that Judge Keefe attained the age of seventy years on April 24, 1985.

Pursuant to Section 2(B)(1)(b), Article IV of the Ohio Constitution,

this court has original jurisdiction in actions seeking the remedy of mandamus. On October 29, 1985, Judge Keefe, as relator, filed a complaint in this court seeking a writ of mandamus to require respondents to certify relator's name to the May 6, 1986 election ballot. Respondents, the board of elections and the Secretary of State, filed motions to dismiss the complaint and these motions were overruled. In due course, respondents filed answers to the complaint. The matter is now before us on the merits.

Section 2, Article I of the Ohio Constitution reads:

"*All political power is inherent in the people.* Government is instituted for their equal protection and benefit, and *they have the right to alter, reform, or abolish the same, whenever they may deem it necessary * * *.*" (Emphasis added.)

Pursuant to the power reserved to themselves, the people of Ohio, on May 7, 1968 by a vote of 925,481 to 556,530, adopted an amendment to the Constitution. The Modern Courts Amendment was approved by a majority of the voters in seventy-seven of the state's eighty-eight counties. As a result of the amendment process, Section 6(C), Article IV of the Ohio Constitution reads, in part:

"No person shall be elected or appointed to any judicial office if on or before the day when he shall assume the office and enter upon the discharge of its duties he shall have attained the age of seventy years. * * *"

Relator challenges this provision on the basis that it is "unconstitutional." Relator contends that the prohibition violates both the Ohio and the United States Constitutions.

I respectfully disagree with the relator's assertions. The amendment containing Section 6(C), Article IV was proposed and presented to, and approved by, the people of Ohio, consistent with their sacred right to legislate for themselves. This right should be held inviolate and should not be disturbed by any court just because the court may not agree in fact or principle with the amendment. The mandatory retirement provision is entitled to the same constitutional respect and enforcement as is accorded any other component of Ohio's ultimate compact between the people and their government. The amendment in question *is* a part of the Constitution itself. As such, it cannot offend the very document of which it is a part. One provision of the basic law of the state simply cannot devour another equal provision. If this were to be permitted, then we would have "major" and "minor" constitutional clauses. We would have some provisions that would be accorded "super" or superior status over other provisions. Obviously, such a situation was never intended by the framers of our sacred document nor do we have the power to so decree. Thus, relator's argument that Section 6(C), Article IV is "unconstitutional" as being in conflict with the Constitution of Ohio is not well-taken.

Relator also argues that the complained-of provision is violative of equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution.

The initial inquiry in establishing whether a violation of equal protection has occurred is to examine the nature of the activity or group being regulated. Thus, "* * * a legislative classification, which implicates neither a suspect classification nor a fundamental interest, is valid if it is rational, *i.e.,* if it is not wholly arbitrary and bears a reasonable relationship to a permissible governmental objective." *Clifford* v. *Daughtery* (1980), 62 Ohio St. 2d 414, 417-418 [16 O.O.3d 443]. See, also, *Massachusetts Bd. of Retirement* v. *Murgia* (1976), 427 U.S. 307.

A classification created by legislation, or as in this case by a constitutional provision, is not rendered invalid because the classification is not perfect. See *State, ex rel. Burton,* v. *Greater Portsmouth Growth Corp.* (1966), 7 Ohio St. 2d 34 [36 O.O.2d 19]; *Massachusetts Bd. of Retirement* v. *Murgia, supra.* The classification need not affect all in an identical manner. Furthermore, there is no fundamental right to run for judicial office, *Trafelet* v. *Thompson* (C.A. 7, 1979), 594 F. 2d 623, certiorari denied (1979), 444 U.S. 906, or to retain public employment, *Malmed* v. *Thornburgh* (C.A. 3, 1980), 621 F. 2d 565, 570. In *Massachusetts Bd. of Retirement* v. *Murgia, supra,* the court held that age is not a suspect class. *Id.* at 313.

Coming now to the rational basis test as applied to mandatory retirement of judicial officers, numerous courts have determined that such a requirement is perfectly consistent with equal protection. See, *e.g., Malmed* v. *Thornburgh, supra; Trafelet* v. *Thompson, supra; Rubino* v. *Ghezzi* (C.A. 2, 1975), 512 F. 2d 431, certiorari denied (1975), 423 U.S. 891; *Grinnell* v. *State* (1981), 121 N.H. 823, 435 A. 2d 523; *O'Neil* v. *Baine* (Mo. 1978), 568 S.W. 2d 761; *Aronstam* v. *Cashman* (1974), 132 Vt. 538, 325 A. 2d 361; *Nelson* v. *Miller* (1971), 25 Utah 2d 277, 480 P. 2d 467. I find no authority of any court of last resort to the contrary.

Accordingly, Ohio's mandatory retirement provision does not violate equal protection. The restriction effects the same results produced by those statutes and state constitutional provisions which already have been declared valid by state and federal courts alike. The reasons for the restriction, articulated by others herein, rationally promote a legitimate state purpose and, therefore, the provision in question, Section 6(C), Article IV, must prevail against constitutional attack.

Finding that the mandatory retirement provision of Section 6(C), Article IV of the Ohio Constitution is constitutional with respect to both the Ohio and the United States Constitutions, the relator has no clear legal right to have his name certified to the May 6, 1986 ballot nor do respondents have a clear legal duty to place relator's name on the ballot. Thus, the requested writ of mandamus must be denied.

In conclusion, I express one final concern. If relator's arguments of equal protection and right to vote are found to be well-taken, it would appear to me that exactly the same arguments could be used to find invalid any constitutional amendment that might be approved by the people of

Ohio, establishing a system for selection and retention of judges through a merit selection plan. The class of persons restricted from seeking election to the judiciary would be much larger than the class alleged to be suspect in the case *sub judice.* Would anyone seriously argue that such plans, variations of which have been adopted by thirty-five of the sovereign states, are unconstitutional for any of the reasons advanced by relator here? This is yet another reason why any tampering with the Constitution and its various provisions is extremely dangerous and unwise.

WRIGHT, J., concurring. There is much to be said for judicial deference to the process whereby the electorate expresses its collective wisdom through an amendment to the Ohio Constitution. One could debate the merits of enforced retirement for judges at age seventy.[2] I could indulge myself in such an exercise, giving dramatic examples of the wisdom of such a provision from my own frame of reference. However, such a process is unnecessary when the substantial majority of the people has spoken on this subject. I say this because if one thing remains clear in the law, it is the proposition that this court should not take liberties with the literal language of the Ohio Constitution. For those who disagree with the constitutional mandate that led to this controversy, a remedy for change is readily available by resort to the same electorate that voted into place the Modern Courts Amendment to the Ohio Constitution. Section 6(C), Article IV of the Constitution.

The "strict scrutiny" analysis urged by the minority is entirely inappropriate. Age has never been considered a suspect classification for purposes of due process or equal protection analysis.[3] See *Vance* v. *Bradley* (1979), 440 U.S. 93; *Massachusetts Bd. of Retirement* v. *Murgia* (1976), 427 U.S. 307. Also, no fundamental right is implicated by the mandatory retirement provisions.

Relator has no fundamental right to governmental employment, see *Massachusetts Bd. of Retirement, supra,* or to run for elective office, see *Bullock* v. *Carter* (1972), 405 U.S. 134. Relator imaginatively alleges an infringement of a fundamental right to vote for himself. Neither the United States Supreme Court nor this court has ever recognized a constitutional right to vote for a particular candidate.

The minority cites ballot access cases to support the contention that a fundamental right to vote is involved. See *Illinois State Bd. of Elections* v.

---

[2] I have no doubt that relator is a competent and well-respected member of the judiciary who has served his constituents well and will continue to do so by way of appointment to service as a retired judge. See Section 6(C), Article IV of the Constitution.

[3] No Ohio law makes age a suspect classification under these circumstances. Although R.C. 4112.02(A) provides that employers may not discriminate on the basis of age, the statute also provides for the establishment of mandatory retirement plans, R.C. 4112.02(O)(3).

*Socialist Workers Party* (1979), 440 U.S. 173; *Communist Party of Indiana* v. *Whitcomb* (1974), 414 U.S. 441; *Bullock, supra.* These cases express a concern that political and economic minorities be represented on the ballot. Certainly, the minority would agree that judges over the age of seventy represent no particular political viewpoint that would otherwise be denied to the voters. In fact, the concern inherent in the ballot access cases that diverse political viewpoints be represented in elections does not apply to a judicial election in Ohio, because candidates for judicial office are not allowed to announce their "views on disputed legal or political issues." See Canon 7B(1)(c) of the Code of Judicial Conduct. A mandatory retirement provision imposes no bar upon any particular political or economic group seeking to field a candidate for election. The challenged retirement provision no more denies relator or any other voter the right to vote than do constitutional minimum age requirements for any elected official. See Clause 2, Section 2, Article I, United States Constitution (member of United States House of Representatives must be twenty-five years of age); Clause 3, Section 3, Article I, United States Constitution (member of United States Senate must be thirty years of age); Clause 4, Section 1, Article II, United States Constitution (President must be thirty-five years of age).

The United States Supreme Court has stated that "* * * not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review. * * *" *Bullock, supra,* at 143. The challenged provision of the Ohio Modern Courts Amendment is simply a retirement provision that has just such an incidental impact upon ballot access. See *Aronstam* v. *Cashman* (1974), 132 Vt. 538, 325 A. 2d 361.

Even if relator's assertions as to fundamental rights and suspect classifications were as colorable as they are creative, they certainly do not satisfy the strict standards this court has always applied to the issuance of a writ of mandamus. See, *e.g., State, ex rel. Berger,* v. *McMonagle* (1983), 6 Ohio St. 3d 28. The mandatory judicial retirement provision in the Ohio Constitution is unambiguous. The Secretary of State has no clear legal duty to certify relator for the ballot. In fact, the Secretary of State has a clear legal duty to *refuse* to certify any candidate for judicial office who is over the age of seventy.

There is no vagueness or ambiguity in this constitutional provision. Like the restriction that a sitting judge may not run in a partisan election for political office, see, *e.g., Morial* v. *Judiciary Comm.* (C.A. 5, 1977), 565 F. 2d 295, certiorari denied (1978), 435 U.S. 1013, the age restriction is a reasonable restraint and does not deny relator due process or equal protection of the law.[4] See *Malmed* v. *Thornburgh* (C.A. 3, 1980), 621 F. 2d 565,

---

[4] Likewise, the prohibition of a two-term incumbent Governor from running for reelection has been found to be constitutionally permissible. See *State, ex rel. Rhodes,* v. *Brown* (1973), 34 Ohio St. 2d 101 [63 O.O.2d 189]. See, also, *Talbot* v. *Pyke* (C.A. 6, 1976), 533 F. 2d 331.

certiorari denied (1980), 449 U.S. 955; *Rubino* v. *Ghezzi* (C.A. 2, 1975), 512 F. 2d 431, certiorari denied (1975), 423 U.S. 891; *Trafelet* v. *Thompson* (C.A. 7, 1979), 594 F. 2d 623, certiorari denied (1979), 444 U.S. 906. See, also, *Boughton* v. *Price* (1950), 70 Idaho 243, 215 P. 2d 286; *In re Levy* (La. 1983), 427 So. 2d 844; *O'Neil* v. *Baine* (Mo. 1978), 568 S.W. 2d 761; *Grinnell* v. *State* (1981), 121 N.H. 823, 435 A. 2d 523; *Maresca* v. *Cuomo* (1984), 64 N.Y. 2d 242, 485 N.Y. Supp. 2d 724, 475 N.E. 2d 95; *Nelson* v. *Miller* (1971), 25 Utah 2d 277, 480 P. 2d 467; *Aronstam* v. *Cashman, supra.*

Thus, I concur in the majority opinion.

CELEBREZZE, C.J., dissenting. I dissent from the majority's disposition of this case, because it is a flat, flagrant, and open violation of the rights guaranteed to Judge Keefe by the Constitution of the United States. And, if this were not enough, the majority also commits the grievous error of undercutting the basic and fundamental right to vote of those who would support Judge Keefe, and those judges similarly situated, in their bids for reelection.

In actual operation, the judicial "retirement" provision in Section 6(C), Article IV of the Ohio Constitution does not preclude a judge from occupying the bench after he turns seventy. For example, if elected at age sixty-nine, an Ohio judge can complete the term for which he was elected, not "retiring" until age seventy-five. Also, he may be appointed to temporary service by the Chief Justice of this court at any age. The "retirement" provision only bars a candidacy for election after age seventy. So, while a judge can finish a term begun before age seventy and can, at any age, serve by assignment of the Chief Justice, he is forbidden to serve by assignment of the people of Ohio. As a result, we face two intertwined and related problems: first, the right of a person to be a candidate for the bench after age seventy, and second, the right of the electorate to vote for the septuagenarian judicial candidate.

The majority opinion relies on irrelevant precedent, and refuses to acknowledge the most recent pronouncements from the United States Supreme Court which govern the issues herein.

The majority states that the federal Constitution dictates only a rational basis standard of review in mandatory retirement cases, *Vance* v. *Bradley* (1979), 440 U.S. 93; *Massachusetts Bd. of Retirement* v. *Murgia* (1976), 427 U.S. 307. But because of the right-to-vote implications of this case, and because voting is a personal, fundamental right, *Reynolds* v. *Sims* (1964), 377 U.S. 533, a higher standard of review is required.

In ballot access cases, the United States Supreme Court has considered both the right of the candidate to have his name put before the electorate as well as the interests the voters have in considering the candidate and voting for him.

In *Bullock* v. *Carter* (1972), 405 U.S. 134, the court considered a challenge to a Texas filing fee system. There, it was claimed that the fees

imposed were excessive and effectively barred some candidates from the ballot. Chief Justice Burger wrote at 143 that "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." He further noted that some candidates "are in every practical sense precluded from seeking the nomination of their chosen party, no matter how qualified they might be, and no matter how broad or enthusiastic their popular support." *Id.* The court used a *strict scrutiny* standard of review in *Bullock:* "Because the Texas filing-fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate, we conclude, as in *Harper* [v. *Virginia Board of Elections* (1966), 383 U.S. 663], that laws must be 'closely scrutinized' * * *." *Id.* at 144.

*Lubin* v. *Panish* (1974), 415 U.S. 709, was another ballot access case involving filing fees. The state of California there contended that its fee scheme was necessary to discourage frivolous candidacies. The court agreed that such candidacies tend to result in "laundry list" ballots, which "discourage voter participation and confuse and frustrate those who do participate * * *." *Id.* at 715. But, Chief Justice Burger, writing for the court, said at 716: "This legitimate state interest, however, must be achieved by a means that does not unfairly or unnecessarily burden either a minority party's *or an individual candidate's equally important interest* in the continued availability of political opportunity." (Emphasis added.) And, echoing *Bullock,* the Chief Justice remarked: "The interests involved are not merely those of parties or individual candidates; the voters can assert their preferences only through candidates or parties or both and *it is this broad interest that must be weighed in the balance. The right of a party or an individual to a place on the ballot is entitled to protection and is intertwined with the right of voters."* (Emphasis added.) *Id.* Continuing, the court declared: "[T]he right to vote is 'heavily burdened' if that vote may be cast only for one of two candidates in a primary election at a time when other candidates are clamoring for a place on the ballot. It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Id.* "The point, of course, is that ballot access must be genuinely open to all, subject to reasonable requirements." *Id.* at 719.

In *Communist Party of Indiana* v. *Whitcomb* (1974), 414 U.S. 441, the court considered a challenge to a statute that denied ballot space to candidates who refused to take an oath that they did not advocate overthrow of the government. Again reverting to a strict scrutiny review, the court noted that the First Amendment's freedom of association protects "access to the ballot, rights of association in the political party of one's choice, *interests in casting an effective vote and in running for office* * * *." (Emphasis added.) *Id.* at 449.

Another case compelling a result opposite to the majority opinion is *Illinois State Bd. of Elections* v. *Socialist Workers Party* (1979), 440 U.S. 173. Challenged was the state's requirement as to the number of signatures for nominating petitions. The claim was that the number established by law was excessive and prohibited new and minority parties from participating in elections. Consistent with its previous cases, the Supreme Court at 184 said:

"*Restrictions on access to the ballot burden two distinct and fundamental rights, 'the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'* Williams v. Rhodes, *supra* [(1968), 393 U.S.] [45 O.O.2d 236], at 30.[5] The freedom to associate as a political party, a right we have recognized as fundamental * * * [citation omitted], has diminished practical value if the party can be kept off the ballot. Access restrictions also implicate the right to vote because absent recourse to referendums, 'voters can assert their preferences only through candidates or parties or both.' * * * [Citations omitted.] *By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences.* And for reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure. * * * [Citations omitted.]

"*When such vital individual rights are at stake, a State must establish that its classification is necessary to serve a compelling interest.* * * * [Citations omitted.]" (Emphasis added.)

Further in that same vein, the court pointed out: "However, our previous opinions have also emphasized that 'even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty,' * * * [citation omitted], and we have required that States adopt the least drastic means to achieve their ends. * * * [Citation omitted.] This requirement is particularly important where restrictions on access to the ballot are involved." *Id.* at 185. "[A]n election campaign is a means of disseminating ideas as well as attaining political office. * * * [Citations omitted.] Overbroad restrictions on ballot access jeopardize this form of political expression." *Id.* at 186.

And finally, just a short while ago, the United States Supreme Court decided *Anderson* v. *Celebrezze* (1983), 460 U.S. 780. At issue was this state's requirement that independent candidates for President and Vice

---

[5] In *Williams* v. *Rhodes, supra,* it was further stated that "[b]oth of these rights, of course, rank among our most precious freedoms. We have repeatedly held that freedom of association is protected by the First Amendment. * * * Similarly, we have said with reference to the right to vote: 'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.' " *Id.* at 30-31.

President file nominating petitions no later than seventy-five days before the primary election date. In holding this provision unconstitutional under the First and Fourteenth Amendments, the court reiterated the stand it had taken in the cases we have thus far discussed. The court said at 786: "Our primary concern is with the tendency of ballot access restrictions 'to limit the field of candidates from which the voters might choose.' Therefore, 'in approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.' " The court then provided these guidelines on evaluating such restrictions under the federal Constitution: A court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." *Id.* at 789.

The "character and magnitude of the asserted injury" has manifested itself. Under Section 6(C), Article IV of the Ohio Constitution, relator is denied a chance to be a candidate for reelection to the court of appeals. His supporters are denied an opportunity to vote for a candidate whose conduct of the office is in accord with their own philosophy. Together, these restrictions operate to prevent both relator and his backers from associating for the advancement of political beliefs, and such restrictions, as well, preclude them from effectively casting their votes, in violation of the First and Fourteenth Amendments.

What are the "precise interests put forward by the State as justifications" for infringing on these rights?

Respondents rely primarily on *Malmed* v. *Thornburgh* (1980), 621 F. 2d 565, where the Third Circuit Court of Appeals upheld Pennsylvania's prohibition on candidates standing for election to judicial office after age seventy. The *Malmed* opinion sets forth four reasons in support of the ban: (1) that retired judges furnish a pool of judicial manpower to help ease court congestion, while younger judges are provided a means to move into the system, (2) that mandatory retirement eliminates the unpleasantness of selectively removing senile judges, (3) that mandatory retirement prevents harm to the justice system by senile judges who can " 'undo the efforts of a hundred excellent Judges,' " and (4) that mandatory retirement conforms to the recommendations of bar associations and other groups, and corresponds with the trend in other public and private employment.

Can the interests promoted by the respondents withstand the strict scrutiny we are required to give them, and are they of such magnitude and

importance that relator's federal constitutional rights must give way in the face of them? Unquestionably and absolutely not.

The Pennsylvania constitutional provisions under review in *Malmed* v. *Thornburgh, supra,* were markedly different from Ohio's. Pennsylvania's judges do not run in competitive elections, but rather must periodically face a retention election where no other candidate is considered. Section 15, Article V of the Pennsylvania Constitution.[6] Also, upon reaching seventy, a Pennsylvania judge must retire immediately. He cannot complete his term. Section 16(b), Article V of the Pennsylvania Constitution. Retired judges can, however, be assigned to temporary service. Section 16(c), Article V of the Pennsylvania Constitution. Also, the *Malmed* decision seriously errs by not considering the right-to-vote issue always discussed by the Supreme Court in ballot access cases. Consequently, *Malmed* employed only a rational basis standard of review, instead of strict scrutiny. *Malmed* is unpersuasive in the present case because of that omission.

The claim that retired judges increase judicial manpower is undoubtedly true, but if court congestion is a real problem, the legislature should act, since it alone has the power to establish courts and provide for the number of judges. Section 15, Article IV of the Ohio Constitution. This remedy is far more desirable than trampling under foot a seventy-year-old's right of ballot access with its consequent removal of his candidacy from voter consideration.

The state may indeed be saved in a few cases from the unpleasant task of removing a disabled judge from the bench. But I cannot endorse — as the majority does — the violation of a candidate's right to compete for judicial office and sanction the denial of the electorate's right to consider him, when less constitutionally intrusive means of addressing the problem are available. For example, R.C. 2701.11 and 2701.12 allow for the removal and forced retirement of judges for disability. In addition, this court's Rules for the Government of the Judiciary permit the suspension of a judge for mental illness. See, *e.g.,* Gov. Jud. R. II 5(b) and II 10(b). It is commonly known that mental disease can occur at any age. In fact, the judicial age ban was completely ineffective as a remedy to the problems we faced in the disabled judge case of *Ohio State Bar Assn.* v. *Mayer* (1978), 54 Ohio St. 2d 431 [8 O.O.3d 434]. Another safeguard in Ohio is the fact that candidates compete for judicial office, and during the campaign itself all sorts of information — both good and bad — become available to the voting public. What better way to preserve the integrity of the state's

---

[6] This difference between judicial selection methods in Ohio and Pennsylvania is more important than it first appears to be. The philosophical debate between supporters of two competing candidates for the bench is almost always more intense than it is in retention elections where judges are measured only against their records. Hence, because the exercise of speech and exchange of ideas are more manifest in competitive elections, the interest in preserving First Amendment protections is much more compelling.

judicial system than to resort to the repository of democracy — the electorate — and allow it to choose those who are qualified, and to reject and put to pasture those who are not? Finally, there is no age restriction on any other elected official to prevent his consideration by the voters. In all fairness, judges should not carry this age burden if no other official is required to carry it. In fact, given our adversary system of justice, it stands to reason that parties to any lawsuit, in vigilant advocacy of their positions, would be the first to detect and take steps to remedy the situation should the robe of senility cast itself about the bench. The opportunity for this kind of personal association with other official decision makers is not generally present; yet, other officials can aspire to elective office at any age.

The popularity of mandatory retirement in other public and private employment is completely irrelevant to the instant dispute. Appointed officials and workers in the private sector do not hold their jobs by virtue of having been elected to them. Consequently, the First and Fourteenth Amendments' guarantees concerning freedom of expression and association, with their related rights to vote and run for office, are not involved in such cases.

The majority embraces *Malmed* v. *Thornburgh, supra,* but that opinion is built around the erroneous presumption that a judge somehow becomes mentally incompetent as he passes his seventieth birthday. Then the majority retreats from this outrageous and astonishing proposition by attempting to soften its *per curiam* opinion with a parade of concurring opinions. What one is left with, as he ends this bewildering visit to the temple of justice, is a shell of reason that crumbles under the slightest weight of logic.

Whatever may have been the concept about age one hundred, fifty, or even eighteen years ago, it is a bright fact today that medical science, improved nutrition and better health have all combined to lengthen the span of salubrious living so that there is no presumption that in one's seventies, eighties, or even nineties, one must fall victim to senility and decrepitude. But, even before the present age of added physical and mental longevity, history has taught us about scores of septuagenarians, octogenarians, and sometimes centenarians whose vigor did not diminish in their mature years. Three illustrious examples served in the United States Supreme Court. Justice Oliver Wendell Holmes served this nation into his ninety-first year. Justice Louis D. Brandeis did not retire until age eighty-three. And more recently Justice Hugo L. Black proved that the demanding work of a judge was no match for a man of eighty-five. The most highly acclaimed opinions of all three of these jurists were written in the post-seventy era of life. Even today, a majority of the justices serving on the Supreme Court of the United States are past seventy-six. Ronald Reagan, the President of the United States, remains vigorous at seventy-four, and of those in line to succeed him, the Speaker of the United States House of

Representatives, Thomas P. O'Neill, Jr., is seventy-three and the President Pro Tempore of the United States Senate, Strom Thurmond, is eighty-three. The fact of the President's overwhelming election triumph is conclusive evidence that the American people — and indeed the people of Ohio — no longer consider senior citizenship to be a condition of ineptitude calling for the wholesale shelving of this precious resource of humanity. Our country is increasingly becoming more aware of the unequaled value that the senior citizen can offer in the way of wisdom, experience, and acquired skill. We now know that old age is no more evidence *per se* of feeblemindedness than a beard is proof of sagacity and good judgment. But, in the face of this modern, enlightened attitude, the majority of this court has leveled a shameful attack on the mature citizens of our society — and particularly those whose backgrounds are filled with experience in the eminent vineyard of the law. It is as regrettable as it is incredible that at this late date in history, this court, by today's decision, pins the loathsome badge of decrepitude and mental infirmity on the senior jurists of Ohio.

It is ironic, to say the least, that it took the experience and perceptiveness of Judge Keefe, a seasoned judge, to recognize the constitutional folly and manifest unfairness of this state's age limit on judicial candidacies. Struggling against the flames of an age restriction that threatens to engulf and reduce to ashes his federal constitutional rights, Judge Keefe has called to this court for help. But instead of throwing him, and those like him, a fire extinguisher, the majority tosses him a gasoline canister that irretrievably ignites Judge Keefe's cries for relief, and dooms his federal rights to the fires of arbitrary oblivion. As Justice Musmanno once wrote, "How all this can be done in this age of a supposedly more sensitive approach to [human] rights * * * is a riddle, wrapped in a mystery, enveloped in an enigma, and concealed in a labyrinth of inexplicability."

I dissent.

SWEENEY, J., dissenting. The majority here has erroneously applied the rational basis test to the instant cause, and has thereby ignored the abundant precedents laid down by the United States Supreme Court that require a strict scrutiny analysis in right-to-vote ballot access cases. See *Bullock* v. *Carter* (1972), 405 U.S. 134; *Lubin* v. *Panish* (1974), 415 U.S. 709; *Communist Party of Indiana* v. *Whitcomb* (1974), 414 U.S. 441; *Illinois State Bd. of Elections* v. *Socialist Workers Party* (1979), 440 U.S. 173; and *Anderson* v. *Celebrezze* (1983), 460 U.S. 780.

By upholding Section 6(C), Article IV of the Ohio Constitution, the majority is not only denying the relator the opportunity to be a candidate for reelection to the court of appeals, it is also denying his supporters the opportunity to vote for a candidate whose conduct of the office is in line with their own particular beliefs. I find that these restrictions operate to prevent both relator and his supporters from freely associating for the ad-

vancement of political beliefs, as well as preclude them from effectively casting their votes. I believe that such a set of circumstances renders Section 6(C), Article IV of the Ohio Constitution unconstitutional under the First and Fourteenth Amendments to the United States Constitution.

The majority opinion relies on the case of *Malmed* v. *Thornburgh* (C.A. 3, 1980), 621 F. 2d 565; however, the majority fails to recognize that Pennsylvania constitutional provisions under review in that cause were different from the Ohio constitutional provision in the cause *sub judice*. Judges in Pennsylvania do not run in competitive elections, but rather must periodically face a retention election where no other candidate is considered. The court in *Malmed* did not consider the right-to-vote issue which is central to the instant cause and, thus, it did not employ the strict scrutiny analysis that is required in the consideration of cases where such an issue is prominent.

Constitutional analysis aside, the fact remains that in all fairness, judges should not be precluded from seeking elected office on account of age inasmuch as no other elected official faces such a restriction.

In any event, I feet that the age ban in issue does not necessarily accomplish its avowed purpose of ridding the bench of mentally incompetent jurists. Mental disease can occur at any age and the General Assembly and this court have already provided methods by statute and by rule for dealing with disabled judges. See, *e.g.,* Gov. Jud. R. II(5)(b) and II10(b); R.C. 2701.11 and 2701.12; and *Ohio State Bar Assn.* v. *Mayer* (1978), 54 Ohio St. 2d 431 [8 O.O.3d 434]. In keeping with federal constitutional principles, I believe that these alternative means are more effective, and less constitutionally intrusive, than the age-bar to judicial candidates.

Given the unconstitutional nature of Section 6(C), Article IV of the Ohio Constitution in light of the supreme law of the land contained in the First and Fourteenth Amendments to the United States Constitution, I believe that the relator has a clear right to the relief prayed for. This, in turn, means that the respondents have a clear legal duty to certify relator's name for the election ballot. Since the relator has no plain and adequate remedy in the ordinary course of law, mandamus is the proper alternative for the redress he seeks.

Based upon the foregoing, the writ of mandamus should be allowed.