OPINION
{¶ 1} Plaintiffs-appellants, Tracy Ashcraft and Carolyn Ashcraft, appeal from a judgment of the Court of Claims of Ohio in favor of defendant-appellee, University of Cincinnati Hospital ("University Hospital"), in appellants' medical negligence action arising from diagnosis, treatment, and surgery administered to Tracy Ashcraft in the course of care by Drs. Michael Privitera and George Morris while employed by University Hospital.
 {¶ 2} Tracy, born in 1968, suffers from disabling epilepsy. Carolyn is his mother and primary caretaker, as Tracy's father is deceased. When Tracy was in the first or second grade in school, he was diagnosed with perceptual and motor problems and prescribed Valium for his hyperactivity. He did not, however, suffer from seizures at this time. Subsequently, when Tracy was eight years old, he was accidentally struck in the head or neck with a baseball bat. He was ten years old before he had his first grand mal seizure. Seizures initially occurred at long and irregular intervals but became more frequent through his middle teens. Anticonvulsant medications were prescribed by Dr. Harold Fogelson, Tracy's treating neurologist. A report prepared by Dr. Fogelson in 1983 noted that Tracy had problems with coordination and that he had difficulties with visual and motor function on his left side and exhibited violent temper outbursts. After having been an above-average student, Tracy's grades became poor. He was also exhibiting other psychological problems, including depression, and was referred for psychiatric counseling and testing.
 {¶ 3} Based on both the neurological and psychological evaluations of Tracy's worsening condition, Carolyn and Tracy sought help from specialists at University Hospital in 1989. From June 5 through June 14, 1989, Tracy underwent a "Phase I" evaluation to determine whether he was a candidate for epilepsy surgery that would relieve his seizure symptoms. The evaluation involved consultation with neurologists, a neurosurgeon, and neuropsychologists. Multiple tests were administered, including an MRI, neuropsychological tests and electroencephalograms ("EEGs") using externally placed electrodes. Tracy was then referred for "Phase II" testing involving an EEG using intracranial electrodes placed directly on the brain during surgery, in an attempt to further localize the source of his seizures and determine whether he was a good candidate for surgery.
 {¶ 4} After evaluation of the test results, Tracy underwent brain surgery involving removal of sections of brain tissue in an attempt to remove the primary source of Tracy's epileptic seizures. The surgery itself went well, and Tracy experienced a temporary cessation of seizures. However, by January 1, 1990, his seizures resumed.
 {¶ 5} Tracy underwent further testing and treatment with anticonvulsant medications, initially with Dr. Privitera, and by October 1990 with other neurologists. His seizures increased in frequency, and he experienced behavioral problems, including physically violent rages, which made him difficult to care for. The source of these additional psychological and behavioral problems is the principal matter of factual dispute in the case; appellants assert that they are the legacy of the surgery, which removed portions of Tracy's brain governing impulse control, and appellee asserts to the contrary that they are attributable to adverse reactions to anticonvulsant medications administered after Tracy left Dr. Privitera's care, or are attributable to pre-existing degenerative brain injuries.
 {¶ 6} During the course of treatment and testing administered after surgery between January 1990 and May 1993, appellants were provided with test results which they interpreted as indicating that Tracy's epileptic seizures originated in multiple areas of the brain other than those removed during surgery, and that Tracy had never been, if these later test results could be related back to his condition before surgery, a suitable candidate for surgical treatment.
 {¶ 7} Appellants initiated litigation with a lawsuit in federal district court in Cincinnati against Drs. Privitera and Morris, as well as Dr. Hwa-Shain Yeh, the neurosurgeon who performed both the testing surgery for the implantation of intracranial electrodes and the subsequent brain resection. Drs. Privitera and Morris were eventually dismissed upon stipulation that they were state employees during the course of treatment of Tracy and personally immune from suit. The matter proceeded to trial against Dr. Yeh, and appellants obtained a judgment. They then proceeded to pursue their actions against the state in the Court of Claims based on the treatment administered by Drs. Privitera and Morris. Appellants' complaint in the Court of Claims asserted claims for medical negligence and for failure to obtain the informed consent of Tracy before undertaking the final surgical procedure. The complaint asserts that Tracy has suffered permanent brain damage from the resective surgery, resulting in memory loss, depression, serious emotional distress, loss of earning capacity, and medical expenses. Carolyn Ashcraft alleged damages for past and future time and expense spent nursing and caring for her son, as well as for emotional distress.
 {¶ 8} The Court of Claims case was stayed pending outcome of the case in federal district court. After the resolution of the case in federal court, discovery and motion practice resumed in the Court of Claims, and a series of trial dates were set and successively continued.
 {¶ 9} On May 30, 1997, the Court of Claims entered an order vacating its 1992 stay order, bifurcating the issues of liability and damages for trial, and finding that "there is [sic] no immunity issues pursuant to R.C. 2743.02(F)." The determination on immunity was pursuant to an oral stipulation entered into on the record between the parties that Drs. Privitera and Howard were state employees during the course of their treatment of Tracy and, thus, immune from suit personally, so that the Court of Claims was the proper venue for the action to be brought against the state. The existence, if not the effect, of this stipulation is not contested by appellants.
 {¶ 10} After further multiple continuances for various reasons, the matter proceeded to a bifurcated trial on the sole issue of liability commencing April 22, 2002. On the second day of trial, the court overruled a motion by appellants to reopen the question of immunity for Drs. Privitera and Morris, based on newly assessed evidence that appellants claimed might indicate that Drs. Privitera and Morris were not acting within the scope of their employment with University Hospital at the time of their treatment of Tracy.
 {¶ 11} The parties presented extensive expert testimony addressing Tracy's condition before and after surgery, the results of the pre-surgery assessment, and Tracy's suitability as a candidate for the type of surgery he underwent. At the close of trial, the court rendered a judgment in favor of appellee on both the medical negligence and informed consent claims.
 {¶ 12} Appellants have timely appealed and bring the following seven assignments of error:
I. The trial court erred to the prejudice of appellants in that the judgment was against the manifest weight of the evidence and the physical facts.
II. The trial court erred in assuming jurisdiction when jurisdiction was not present.
III. The trial court erred to the prejudice of appellants in not granting a constiuance when appellants' witness changed his testimony only several days before trial.
IV. The trial court erred in ruling on the case and in denying plaintiffs' motion as to the statute creating the court of claims is Unconstituttional.
V. The trial court erred to the prejudice of appellants in failing to provide a three judge panel as requested.
VI. The trial court erred in finding that informed consent was given.
VII. The trial court erred to the prejudice of appellants in denying plaintiffs' motion to compel discovery.
 {¶ 13} We will first consider those assignments of error raised by appellants that address procedural matters, leaving the second and sixth assignments of error, which address the evidentiary substance of the case, to be discussed last.
 {¶ 14} Appellants' second assignment of error asserts that the trial court erred in denying appellants' motion to take evidence on the question of whether Drs. Privitera and Morris were acting as state employees during the course of their treatment of Tracy. As appellants correctly state, if the doctors were not acting as state employees, then the Court of Claims lacked jurisdiction to proceed with the case. Appellants relied on several medical billing records Drs. Privitera and Morris issued in the name of a private corporation, University Neurology, Inc. While these billing statements have been available to appellants since 1994, appellants asserted for the first time at trial that these bills constituted indicia that the doctors were not state employees for purposes of Tracy's claims.
 {¶ 15} While appellants acknowledge that they previously had stipulated before the trial court that the physicians were entitled to immunity, they correctly state as a preliminary proposition to this appeal that subject matter jurisdiction cannot be waived and may be raised at any stage of the proceedings. Fox v. Eaton Corp. (1976),48 Ohio St.2d 236, 238. Appellants assert that their prior stipulation, if unsupported by facts giving rise to jurisdiction, is ineffective to grant jurisdiction to the Court of Claims.
 {¶ 16} We cannot, of course, disagree with appellants' contention that subject matter jurisdiction may not be waived, either by stipulation or otherwise. Parties may, however, stipulate to facts that give rise to jurisdiction. Chitwood v. Univ. Med. Ctr. (May 5, 1998), Franklin App. No. 97AP-1235; West Peninsular Title Co. v. Palm Beach Cty. (1995),41 F.3d 1490. Generally, a stipulation, once entered into, may not be unilaterally repudiated by a party. Whitehall, ex rel. Fennessy v. BambiMotel, Inc. (1998), 131 Ohio App.3d 734; Slaughter v. Scott (Mar. 15, 1999), Scioto App. No. 98 CA 2591. While we doubt that this rule is one that must be adhered to in the face of absolute and uncontroverted evidence that the stipulated facts can no longer be taken as true, that is certainly not the case before us. Billing by a private corporation is only one of several indicia that will be used to assess whether a physician is acting within the scope of his employment with a state hospital, and is not of itself conclusive of that issue. Barkan v. TheOhio State Univ. (Mar. 6, 2003), Franklin App. No. 02AP-436. Other than the billing statements, nothing else appears in the record to suggest that Drs. Privitera and Morris were not state employees and that the prior stipulation to that fact should not be given effect. Under the circumstances of this case, we find no error on the part of the trial court in proceeding on the prior stipulation and refusing to reopen the question of immunity for the physicians, and consequently the question of jurisdiction in the Court of Claims. Appellant's second assignment of error is accordingly overruled.
 {¶ 17} Appellant's third assignment of error asserts that the trial court erred in overruling appellant's motion for a continuance on the eve of trial due to a sudden change in opinion by one of appellants' retained experts, neuropsychologist Michael Howard, Ph.D. Appellants had consulted Dr. Howard for some years prior to trial, and during this time he had several times given deposition testimony and professional opinions regarding Tracy's condition prior to and after surgery. Dr. Howard had personally tested Tracy while Tracy was a patient at the Rehabilitation Institute of New Orleans and had examined medical records generated by Tracy's various treating physicians. Counsel for appellants viewed Dr. Howard's professional opinion and anticipated testimony as favorable to appellants' case and accordingly traveled to California to again depose Dr. Howard approximately one week prior to trial. At that time, however, Dr. Howard changed his opinion based either on newly available information or his new interpretation of previously available and reviewed medical reports. Counsel attempted to salvage the deposition by impeaching Dr. Howard with his prior inconsistent statements, but were understandably concerned that this expert's testimony would no longer be useful, and that it would, in fact, be harmful to their case.
 {¶ 18} The grant or denial of a continuance is reviewed by an appellate court under an abuse of discretion standard. State v. Bayless
(1976), 48 Ohio St.2d 73. Factors to be considered are the length of the delay requested, the number of other continuances requested and granted in the case, inconvenience to litigants, witnesses, opposing counsel, and the court, and whether the requesting party contributed to circumstances giving rise to the request. Id. The court should also consider all of the pertinent factors, and each request for a continuance should be evaluated on its own unique facts. Id.
 {¶ 19} The short notice for the requested continuance in a case already continued multiple times over a period of years, and which was scheduled to require appearance of many expert witnesses whose testimony would no doubt be difficult to reschedule in a reasonable time, supports the trial court's denial of a continuance. In addition, appellee points out that Dr. Howard's testimony, because he is not a medical doctor, would not alone have been sufficient to sustain appellant's burden of proof for either a breach of standard of care or the existence of proximate cause in order to sustain their case. Evid.R. 601(D). While Dr. Howard's opinion was obviously anticipated to be helpful to appellant, their medical experts on the above-noted issues remained available.
 {¶ 20} The sum of the factors generally considered in granting or denying a continuance in the present case do not demonstrate an abuse of discretion on the part of the trial court in denying appellants' request for a continuance. Appellants' third assignment of error is accordingly overruled.
 {¶ 21} Appellants' fourth assignment of error asserts that the legislation creating the Court of Claims of Ohio, codified at R.C. 2743.02
and 2743.03, violate the United States and Ohio Constitutions by denying due process and equal protection to litigants. Appellants claim that both the unavailability of trial by jury in claims against the state in the Court of Claims and the appointment of retired judges over the age of 70 are constitutionally infirm.
 {¶ 22} Appellants' arguments regarding the unavailability of a jury trial in the Court of Claims have been addressed and unfavorably decided by the Ohio Supreme Court and subsequently by this court in a case in which current counsel for appellants participated. Conley v. Shearer
(1992), 64 Ohio St.3d 284, 288; Fisher v. Univ. of Cincinnati Med. Ctr.
(Aug. 25, 1998), Franklin App. No. 98AP-142. These arguments are therefore not well-taken.
 {¶ 23} With respect to the age of the judges sitting in the Court of Claims, appellants rely upon State ex rel. Keefe v. Eyrich (1986),22 Ohio St.3d 164, in which the Ohio Supreme Court held, as a peripheral issue, that it was permissible to impose an age limit (70) beyond which judges may not seek reelection. Keefe ultimately holds, however, that appointment of retired judges to sit on the Court of Claims, be they superannuated or not, does not violate either the Ohio or United States Constitution because the Chief Justice of the Ohio Supreme Court, when assigning retired judges to active duty in the Court of Claims or other courts, retains the discretion to determine whether the judges remain fit to perform their duties. Keefe simply does not support appellants' position, therefore, and appellants' fourth assignment of error is overruled.
 {¶ 24} Appellants' fifth assignment of error asserts that the trial court erred when it failed to grant appellants' motion for appointment of a three-judge panel. R.C. 2743.03(C)(1) and Loc.R. 5 of the Court of Claims provide that, in "complex" matters, a litigant may request a cause be heard by a panel of three judges, rather than the usual single judge. Appellants' only argument in support of prejudicial error is that, if allowed to try the case to a three-judge panel, it is more likely that at least one judge would have seen the merit of their case.
 {¶ 25} The record on this question is rather obscure, and it appears in fact that the motion for a three-judge panel was never ruled upon by the Chief Justice of the Ohio Supreme Court, who under Loc.R. 5 of the Court of Claims, has exclusive authority to grant such a request. A notation on the Court of Claims' docket remarks only that the motion has been rendered "moot." Since the motion was never specifically addressed in the Court of Claims, it is difficult for this court to ascertain error; moreover, it is unlikely that this court has jurisdiction at all to review such a decision by the Chief Justice of the Ohio Supreme Court. In any case, we are unable to ascertain whether the Chief Justice ruled upon appellants' request for a three-judge panel or otherwise why the request was rendered moot. In the absence of a fully developed record or even any allegation by appellants on appeal that, for example, the Court of Claims neglected to properly transmit the request to the Chief Justice for a ruling, we are constrained to presume the regularity of proceedings in the court below, particularly since appellants did not renew their request for a three-judge panel at any time prior to or during trial. Appellants' fifth assignment of error is overruled.
 {¶ 26} Appellants' seventh assignment of error asserts that the trial court erred in denying a motion to compel more specific discovery with respect to certain medical records. The evidence in question concerned large paper rolls on which were inscribed the readouts from electrodes during Tracy's electroencephalogram tests. Apparently, at some point during the discovery process, appellee asserted that certain brain wave forms could be found on these EEG tracings, and when appellants requested that appellee point out specifically where on these voluminous records such brain waves could be found, appellee refused to disclose the specific locations on the grounds that the discovery materials requested had already been provided in the form of the raw EEG data, and that it was up to appellants to secure their own expert analysis to analyze the information.
 {¶ 27} Without passing upon the general question of whether such discovery could in some circumstances specifically be compelled by a trial court in the interest of, for example, judicial economy and in speeding the discovery process and reaching the merits of a claim, we find in the present case that appellants have failed to particularize any prejudice to their case devolving from the trial court's refusal to compel discovery, nor have appellants rebutted appellee's contention that the specific information was ultimately disclosed through deposition testimony of defense experts well before trial. Appellants' seventh assignment of error is accordingly overruled.
 {¶ 28} We now turn to appellants' two principal assignments of error, which both assert that the trial court's judgment is against the manifest weight of the evidence. When reviewing a trial court's decision on a manifest weight of the evidence basis, we are guided by the presumption that the factual findings of the trial court were correct. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflections, and gestures. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77. Thus, judgments supported by some competent, credible evidence going to all the essential elements will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. FoleyConstr. Co. (1978), 54 Ohio St.2d 279.
 {¶ 29} Appellants' first assignment of error asserts that the trial court erred by finding, against the manifest weight of the evidence, that Drs. Privitera and Morris had not been negligent in their treatment of Tracy.
 {¶ 30} In very general terms, there were two factual issues to be resolved in appellants' medical negligence claim. The first was whether pre-surgery testing was properly conducted and the source of Tracy's epileptic seizures correctly "mapped" in assessing his suitability for epilepsy surgery. The second is whether, beyond the fact that the surgery did not relieve his epileptic symptoms in the long run, Tracy's post-surgery behavior problems were caused by his preexisting epileptic condition, which the surgery failed to remedy, or were significantly worsened by the effects of the surgery.
 {¶ 31} Appellants sought to establish through expert testimony that Tracy from the outset presented seizures originating in multiple foci, or locations in the brain, a condition that made him a poor candidate for surgery and should have been discovered during pre-surgery testing by, inter alia, more comprehensive placement of EEG electrodes on his brain. Appellants assert that the condition was readily ascertainable with proper testing, and was, in fact, detected post-surgery in a subsequent examination by doctors at the Cleveland Clinic.
 {¶ 32} University Hospital sought to establish to the contrary that Tracy's seizures and behavior problems were caused by his preexisting brain injury and by his post-surgery noncompliance in taking anti-convulsant medication, as well as by adverse reactions to post-surgery medications prescribed by subsequent treating physicians.
 {¶ 33} Experts for both sides agreed on various basic premises regarding Tracy's condition. They all described epilepsy as a brain dysfunction resulting either from a genetic predisposition or an injury to the brain and manifesting itself by seizures. Many persons suffering from epilepsy will have only occasional seizures that can be controlled with medication, but Tracy suffered from "intractable epilepsy," poorly controlled by medication. If uncontrolled, seizures will worsen and brain injury will spread more or less proportionately to the frequency and severity of seizures experienced, i.e., "seizures beget seizures."
 {¶ 34} For patients with intractable epilepsy, surgery to eliminate the predominant known area or areas — foci — from which seizures originate, or to physically separate these areas from the rest of the brain so the electrical discharges manifested in the seizures will not spread throughout the brain, is often effective to limit both the severity and degenerative effect of the seizures. Various surgical techniques in removal of different parts of the affected brain areas will give varying degrees of improvement: the success rate for frontal lobe surgery is 50 percent or better, for temporal lobe surgery, it is substantially higher. Even after surgery, patients will typically require continued medication, even if the surgery is successful.
 {¶ 35} The first stage of Tracy's evaluation at University Hospital, known as Phase I testing, involved laboratory tests, an MRI, neuropsychological testing, and electroencephalograms to record Tracy's seizures. His seizures were recorded on a videotape to correlate with the EEG. Readouts were from electrodes placed on Tracy's scalp.
 {¶ 36} Based on the initial Phase I evaluation, Tracy was referred to Phase II, which involved surgery to open Tracy's skull and implant electrodes on the surface of the brain. The surgery was performed by Dr. Yeh. Dr. Privitera, who was the attending physician for the Phase I evaluation and as a board-certified neurologist with special training in epilepsy and EEG interpretation, continued to participate in the Phase II evaluation. Dr. Morris was at the time completing an epilepsy fellowship at University Hospital and was also a member of Tracy's epilepsy "team." The initial working diagnosis by Dr. Privitera was that Tracy's seizures originated in his frontal lobe. During this time, Tracy also underwent testing by Dianne Rigish, Ph.D., including the Minnesota Multi-Phase Personality Inventory ("MMPI test") and the Wechesler Adult Intelligence test, a form of I.Q. test.
 {¶ 37} When Dr. Yeh undertook the Phase II evaluation by placing intracranial electrodes directly on the brain, he was aware of Dr. Privitera's working diagnosis of seizures originating in the right frontal lobe; despite the fact that Dr. Privitera had recommended electrode placement on the left temporal lobe to measure possible seizure activity there, Dr. Yeh did not place electrodes in that location. After the implantation surgery, Tracy was again monitored and his seizures recorded.
 {¶ 38} After the Phase II evaluation, Drs. Morris, Privitera, and Yeh met to discuss the test data and concluded that their initial diagnosis of regional onset in the right frontal lobe had been confirmed. Dr. Yeh then performed a "right anterior, intermediate and orbital frontal corticectomy and partial anterior corpus callosotomy."
 {¶ 39} Tracy was discharged after his surgery and followed from September 1989 through September 1990 with treatment by Dr. Privitera. Tracy was seizure-free until January 1, 1990. Thereafter, the frequency and intensity of seizures was variable. During this time, Tracy also received psychological counseling from Dr. Rigrish, who recorded the results of these neuropsychological tests and compared them with the pre-surgical baseline established by June 1989 tests.
 {¶ 40} After leaving the care of Drs. Rigrish and Privitera at University Hospital, Tracy underwent neuropsychological evaluations from various providers, including Michael Howard, Ph.D., at the Rehabilitation Institute of New Orleans in February 1993. In May of 1993, Tracy was seen by Dr. Hahns Luders and admitted to the Cleveland Clinic for four days of video EEG-monitoring with scalp electrodes implanted.
 {¶ 41} The parties differed radically in their interpretation of this testing conducted at the Cleveland Clinic, appellants claiming that it demonstrated "Multi-Focal Seizure Disorder" originating partially in the left temporary lobe, which contradicts the findings of Drs. Privitera and Yeh following Phase I and Phase II evaluations prior to Tracy's surgery.
 {¶ 42} The first witness for appellants was Carolyn Ashcraft, who described the progression of Tracy's seizures and treatment pre- and post-surgery. Mrs. Ashcraft stated that Tracy had always been compliant with his epilepsy medication. He had never been evaluated for attention deficit disorder prior to surgery. During at least one period prior to his treatment by Drs. Privitera and Morris, Tracy had experienced adverse reactions to high doses of Tegretol prescribed by his previous treating physician, Dr. Broadnex, and Tracy had a toxic reaction. During his Phase I testing with University Hospital, Tracy had experienced an episode where he became violent while being monitored, including throwing objects. This was diagnosed as a probable reaction to prescribed Ativan.
 {¶ 43} Mrs. Ashcraft testified that, after surgery, Tracy experienced significant behavioral problems. At one point, she awoke to find Tracy standing over her bed holding a knife. Afterwards, he had little recollection of the incident. He would experience violent rages, alternating with a flat affect, and exhibited inappropriate behavior such as stripping naked at a Thanksgiving family dinner. He often acted otherwise inappropriately and without regard to his own personal safety. Mrs. Ashcraft testified that, as a result of this behavior, as well as his continued seizures, Tracy will require continuous care and supervision.
 {¶ 44} The first expert presented by appellants was Dr. John Gates, board certified in neurology and clinical neurophysiology. He is a specialist in the care and treatment of epilepsy. Dr. Gates generally opined that Dr. Privitera's tentative Phase I working diagnosis was correct in its interpretation of data obtained, but specifically left open the possibility that seizures originated in other areas. Dr. Gates felt that the Phase II evaluation was inadequate to locate the source or sources of Tracy's seizures. Dr. Gates felt that Tracy, based on the results of testing, should never have been referred for surgery. On cross-examination, Dr. Gates agreed that it would be difficult to assess the success of surgery if a patient was noncompliant with his post-surgery medication.
 {¶ 45} The next witness presented by appellants was Michael C. Howard, Ph.D., who personally evaluated Tracy at the Rehabilitation Institute of New Orleans in February 1993. This was the expert whose changed testimony caused appellants to move for a continuance. He testified that, although he had previously given an opinion and evaluation report indicating that he felt the surgery was the source of Tracy's problems, he now felt that, with additional information, he could put his test results evaluating Tracy into a more complete context and was no longer able to say whether Tracy's surgery was a significant factor in his subsequent behavioral and cognitive problems. Comparing pre- and post-surgery testing, Dr. Howard found no clinically or significant changes in either the verbal or the performance sections of the I.Q. scores, including a change of verbal I.Q. from 106 in 1991 to 121 in 1993.
 {¶ 46} The last expert presented by appellants was Dr. Yeh, the surgeon who performed Tracy's epilepsy surgery and was the defendant in appellant's federal lawsuit. He testified that Tracy had demonstrated in pre-surgery neuropsychological testing a right frontal lobe dysfunction and no left-brain dysfunction. Because he agreed with Dr. Privitera's conclusion that seizures were localized in origin in the right frontal lobe, surgery was indicated. Dr. Yeh acknowledged that, although Drs. Privitera and Morris had significant roles in the pre-surgical evaluation of Tracy, ultimately the decision lay with Dr. Yeh as the surgeon where to place the electrodes during Phase II testing and whether to proceed with epilepsy surgery involving resection of parts of the brain: "Yeah, the surgery is my decision, because I'm the surgeon, of course, in charge." (Tr. 371-372.)
 {¶ 47} Appellee called two expert witnesses. The first was Dr. Frank Sharbrough, a board-certified neurologist specializing in medical and surgical treatment of epilepsy. He has been a professor of neurology at the Mayo Clinic in Minnesota since 1985, and has evaluated between 800 and 1,000 patients for epilepsy surgery.
 {¶ 48} Dr. Sharbrough testified that there was a wide range in the standard of care in determining suitability of a patient for epilepsy surgery, but that a patient who has shown a regional onset of epilepsy in a frontal lobe is a candidate for surgery. He testified that this is also the consensus opinion of a panel of epilepsy experts selected by the National Institute of Health to set treatment guidelines for epilepsy surgery. Dr. Sharbrough was a member of this panel.
 {¶ 49} Dr. Sharbrough testified that he had reviewed all medical records available both from Tracy's treatment at University Hospital and his subsequent evaluation at the Cleveland Clinic. This included video EEG records and EEG tracings from Phase I and Phase II evaluations. He reviewed these EEG records in court.
 {¶ 50} Dr. Sharbrough's opinion, to a reasonable degree of medical probability, was that Drs. Privitera and Morris acted well within the standard of care in their treatment of Tracy.
 {¶ 51} Dr. Sharbrough's interpretation was that Tracy's seizures originated from the same region in the right frontal lobe, pre-surgery. In epilepsy, however, some seizures, however, spread further than others and involve other areas of the brain. Based upon the EEGs, Dr. Sharbrough concluded that there was no evidence that Tracy had temporal lobe epilepsy at the time of the surgery in 1989. His assessment was that Tracy's seizures originated on the right side, although they might spread beyond that area. Moreover, his seizures were focused in the right frontal lobe and did not appear to originate in the right temporal lobe.
 {¶ 52} Dr. Sharbrough also concluded that the evaluation at the Cleveland Clinic did not show evidence that Tracy had temporal lobe seizures even after his surgery, but that the EEG activity recorded in 1993 was left frontal in origin.
 {¶ 53} Dr. Sharbrough also opined that Tracy had "split" verbal and performance I.Q.'s going back to 1983, which demonstrated a significant problem in right brain performance for some time before his treatment at University Hospital. His opinion was that Tracy's mental, emotional, and behavioral problems were adversely affected by medications administered post-surgery.
 {¶ 54} The other expert testifying for appellee was Dr. Ilo Leppik, a neurologist specializing in epilepsy. He also opined that Drs. Privitera and Morris acted within the standard of care in their treatment of Tracy. He concurred with Dr. Sharbrough that the right frontal lobe was properly identified as the origin of Tracy's seizures pre-surgery. The placement of electrodes in Phase I testing conformed to the standard of care. His final analysis was that Tracy suffered from a progressive epileptic condition that was temporarily slowed or halted by the surgery, but that other damaged brain areas began to generate seizures in areas where they had not originated before. Dr. Leppik reviewed all of Tracy's neuropsychological test scores, and his opinion was that those functions measured by the testing had returned to the pre-surgery 1989 baseline within several years after surgery, and his opinion to a medical probability was that surgery performed in 1989 was not the source of any damage or dysfunction experienced by Tracy since that time.
 {¶ 55} Dr. Leppik explained that, in his professional opinion, many of the emotional and psychological problems experienced by Tracy after surgery were exacerbated by reactions to many of the multiple drugs prescribed for Tracy after surgery, including Ativan and Valium. Dr. Leppik opined that persons demonstrating "splits" between verbal and performance I.Q.s are more subject to emotional problems and disturbances that are likely to be aggravated by adverse reactions to many of the potent medications administered to epilepsy patients.
 {¶ 56} The trial court was thus left to resolve, as is commonly the case in medical negligence or malpractice cases, diametrically opposed testimony from equally qualified experts. If the evidence presented in this case was lengthy, detailed, and complex, and cannot easily be summarized briefly in its content, it can more readily be summed up in its effect upon a review by this court under manifest weight standards. Appellant's evidence on the elements of breach of standard of care and proximate causation of Tracy's post-operative condition was countered by competent, credible evidence which, if believed, would fully support judgment for appellee. Appellants' assertion that the Cleveland Clinic's evaluation found seizures originating in the left temporal lobe in 1993 that were missed in 1989 are addressed and rejected by the competent, credible testimony of Drs. Privitera, Yeh, and Sharbrough that no seizures originated in the left hemisphere in 1989. In particular, Dr. Sharbrough reviewed all records, including EEG results, and personally interpreted them, concluding that there was no evidence of left temporal lobe seizures. The competent, credible testimony of the same qualified defense witnesses indicated that Tracy had seizures with original onset in the right frontal lobe and was a suitable candidate for surgery in 1989. Drs. Sharbrough and Leppik opined that Drs. Privitera and Morris each acted within the standard of care in their treatment of Tracy, opinions that were further buttressed in some respects by the testimony of Dr. Howard, appellants' own non-physician expert.
 {¶ 57} In complex cases, particularly medical negligence or malpractice cases, the trier of fact may rely on expert opinion testimony in making factual determinations. Bruni v. Tatsumi (1976),46 Ohio St.2d 127;Turner v. Children's Hosp. Inc. (1991),76 Ohio App.3d 541. While appellants in this appeal point to certain excerpted passages from opinion testimony and medical reports which, taken in isolation, might support some of their assertions regarding Tracy's condition before and after surgery, extensive, highly qualified medical testimony was offered at trial to interpret that evidence and state that, taken as a whole, the medical records supported appellee's position. In reviewing this matter upon manifest weight grounds, we find no reason to disturb the trial court's decision to rely on the available expert medical testimony in fully understanding and assessing the weight and quality of the evidence in the case. There was, thus, competent credible evidence to support the trial court's decision on all elements of appellants' medical negligence claim finding in favor of appellee. Appellants' first assignment of error accordingly is overruled.
 {¶ 58} Appellants' sixth assignment of error asserts that the trial court erred in finding that Tracy's epilepsy surgery was performed with his informed consent. The elements of the tort of failure to provide informed consent was set forth by the Ohio Supreme Court in Nickell v.Gonzalez (1985), 17 Ohio St.3d 136, at the syllabus:
The tort of lack of informed consent is established when:
(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;
(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and
(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy.
 {¶ 59} In this case, the issue becomes even more one of directly contradictory testimony. Mrs. Ashcraft claimed that she was told there was a 75 percent or higher success rate for improving Tracy's condition by surgery, and that this corresponded with the success probability for temporal lobe surgery, rather than frontal lobe surgery as performed on Tracy. All experts at trial generally agreed that the probability of success for frontal lobe surgery would be substantially lower, perhaps 50 or 60 percent. This is a figure that Dr. Yeh testified he told Mrs. Ashcraft, and both Dr. Sharbrough and appellants' own expert, Dr. Gates, testified that this was a reasonable number to provide to a patient in obtaining informed consent to perform the surgery. The issue thus came down to a credibility question as to the exact percentage of probable success that was provided to the Ashcrafts in preparation for making their decision to have the surgery. Again, credibility of witnesses and the weight to be given to their testimony are primarily questions for the trier of fact, and we find no basis in the present case for reversing the trial court's resolution of this credibility contest. The trial court chose to believe the testimony that indicated the Ashcrafts had been provided with the proper probability of success, and on a manifest weight basis we find no reason to disturb that determination. Appellants' sixth assignment of error is overruled.
 {¶ 60} For the foregoing reasons, appellants' seven assignments of error are overruled, and the judgment of the Court of Claims of Ohio in favor of appellee University of Cinncinnati Hospital is affirmed.
Judgment affirmed.
BOWMAN and KLATT, JJ., concur.
DESHLER, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.