OPINION
{¶ 1} This is an appeal by plaintiff-appellant, Rhonda Botkin, individually, and as administratrix of the estate of Erin Botkin, from an entry of the Ohio Court of Claims, finding that Helen W. Hsu, M.D., is entitled to immunity pursuant to R.C. 9.86 and 2743.02(F).
 {¶ 2} On February 5, 1998, appellant filed a complaint in the Court of Claims against defendant-appellee, University of Cincinnati College of Medicine ("University Hospital"). The complaint alleged that Julia Erin Rayne Botkin ("decedent") was born on February 5, 1997, and at that time was admitted as a patient to the University Hospital. Decedent died on March 2, 1997, and appellant's complaint alleged that the death was a direct and proximate result of appellee's negligence.
 {¶ 3} In addition to appellant's action in the Court of Claims, appellant also filed a complaint in the Hamilton County Court of Common Pleas, naming as defendants University Hospital, Dr. Helen W. Hsu, Dr. Jill M. Zurawski, and Dr. Nathan T. Wegner. On February 6, 2003, the Court of Claims conducted a status conference, at which time counsel for appellant indicated that a physician in the connected action, Dr. Hsu, had asserted the defense of immunity in the connected action.
 {¶ 4} On February 19, 2003, appellant filed a motion seeking an immunity determination as to Dr. Hsu. In that motion, appellant asserted "[t]he parties in the companion common pleas case have agreed that this is not a case which will involve an act of active malpractice concerning performing the surgery." Rather, appellant maintained, "[t]his is a case involving lack of informed consent and falsifying medical records in an attempt to avoid liability."
 {¶ 5} On May 15, 2003, the Court of Claims conducted an evidentiary hearing to determine whether Dr. Hsu should be entitled to civil immunity pursuant to R.C. 2743.02(F) and 9.86. No witnesses were called to testify at the hearing. Instead, at the conclusion of oral arguments, evidence was admitted by way of exhibits and deposition testimony, including the depositions of Drs. Hsu, Zurawski, and Wegner.
 {¶ 6} The trial court rendered a decision on February 2, 2004, and the following background facts are taken primarily from that decision. In July of 1995, Dr. Hsu was appointed to the faculty of appellee's college of medicine for a two-year term as an assistant professor of clinical obstetrics and gynecology. Dr. Hsu received an annual starting salary of $15,000 from the university, and, in 1997, she earned $129,032.88 from the Foundation for Obstetrics and Gynecology, the departmental practice plan established to compensate faculty and instructors for their clinical efforts.
 {¶ 7} Appellant was a patient at appellee's OB-GYN clinic from July 1996 until February 5, 1997, where she received prenatal care and treatment from resident physicians under the supervision of faculty members. In January of 1997, the treating physicians suspected that appellant's fetus was suffering from intrauterine growth restriction ("IGR"), a condition in which the ratio of head circumference to abdominal circumference is asymmetric. During her treatment, appellant expressed an interest in a procedure known as tubal ligation, a form of permanent sterilization. On January 7, 1997, appellant signed a consent form to have doctors perform the tubal ligation procedure following the birth of her child.
 {¶ 8} On February 4, 1997, appellee's staff confirmed that appellant's fetus was suffering from IGR. Appellant was scheduled for a Caesarian section (C-section) the following day, at which time the tubal ligation procedure was also to be performed. According to the deposition testimony of Dr. Zurawski, a fourth-year resident, and Dr. Hsu, the attending physician, appellee's physicians discussed with appellant the risks and benefits of tubal ligation in the context of a patient whose fetus was suffering from IGR. The court noted that, although appellant conceded she was told the fetus suffered from IGR, she claimed she was never informed of the risk of death associated with that condition, and that she never would have consented to the tubal ligation procedure had she been provided that information.
 {¶ 9} Although Dr. Hsu was the attending physician on call at the clinic on February 5, 1997, Dr. Zurawski, and Dr. Wenger, a first-year resident, performed the C-section and the tubal ligation. Dr. Hsu was present during the procedures, but she could not recall whether she had "scrubbed in" for them. Both procedures were performed successfully, but appellant's baby experienced complications at birth and was sent to the neonatal intensive care unit.
 {¶ 10} Dr. Wenger dictated an operative report on the day of surgery (February 5, 1997), and the report was transcribed on February 7, 1997. Dr. Hsu subsequently signed the report as the attending physician. After the report was distributed for review, Dr. Zurawski contacted Dr. Wegner and asked him to amend the report to include a paragraph regarding appellant's desire to have a tubal ligation despite knowledge that her fetus had IGR. On March 2, 1997, appellant's baby died. On March 19, 1997, Dr. Wegner completed a second dictation, which Dr. Hsu later signed.
 {¶ 11} During the immunity hearing, appellant conceded that Dr. Hsu was an employee of appellee, and appellant did not allege medical negligence with respect to the procedures that were performed. Appellant argued, however, that Dr. Hsu acted in a wanton or willful manner when she signed the second operative report because the additional paragraph concerning appellant's informed consent to the tubal ligation constituted a falsification of medical records.
 {¶ 12} The Court of Claims, in its February 2, 2004 decision, found that the evidence failed to show that Dr. Hsu acted with malicious purpose, in bad faith, or in a wanton or reckless manner toward appellant, and, therefore, concluded that Dr. Hsu was entitled to statutory immunity, and that the court of common pleas lacked jurisdiction over the matter. In its decision, the court noted that Dr. Wegner, at the request of Dr. Zurawski, was responsible for drafting both operative reports, and that Dr. Hsu "signs the operative reports as they are given to her," but that her "only involvement with the reports in this case was signing her name as a part of her responsibilities as a faculty member supervising residents."
 {¶ 13} On appeal, appellant sets forth the following five assignments of error for review:
Assignment of error No. 1
The trial court erred to the prejudice of plaintiffs in finding that Dr. Hsu is entitled to immunity pursuant to Ohio Revised Code 9.86 and2743.02(F).
Assignment of error No. 2
The Court of Claims erred to the prejudice of plaintiffs in not continuing immunity determination until discovery had been responded to.
Assignment of error No. 3
The court erred to the prejudice of plaintiffs in granting immunity when no "party" requested that Hsu be granted immunity.
Assignment of error No. 4
The trial court erred to the prejudice of plaintiffs in putting the burden on plaintiffs to disprove Dr. Hsu's immunity.
Assignment of error No. 5
The trial court erred to the prejudice of plaintiffs in not finding that ORC 9.86, 109 and Chapter 2743 as to "immunity" as applied in this case are unconstitutional and violate the Ohio Constitution and the United States Constitution.
 {¶ 14} Under the first assignment of error, appellant challenges the Court of Claims' determination that Dr. Hsu was entitled to immunity pursuant to R.C. 9.86 and 2743.02. Although not characterized as such in her appellate brief, appellant essentially contends that the court's finding of immunity was against the manifest weight of the evidence.
 {¶ 15} R.C. 2743.02(F) provides in part:
A civil action against an officer or employee, as defined in section109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims, which has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action.
 {¶ 16} R.C. 9.86 states in relevant part:
* * * [N]o officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner. * * *
 {¶ 17} In general, the question of whether a physician is entitled to immunity is a question of law. Barkan v. The Ohio State Univ., Franklin App. No. 02AP-436, 2003-Ohio-985, at ¶ 11. However, the question as to whether a physician acted outside the scope of his or her employment is a question of fact. Id. Thus, "[i]n this regard, matters involving credibility should be resolved by the trial court, and judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed as being against the manifest weight of the evidence." Scarberry v. Ohio State Univ. Hospitals (Dec. 3, 1998), Franklin App. No. 98AP-143. Further, "[i]t is only where the acts of state employees are motivated by actual malice or other such reasons giving rise to punitive damages that their conduct may be outside the scope of their state employment." James H. v. Dept. of Mental Health Mental Retardation (1980), 1 Ohio App.3d 60, 61.
 {¶ 18} Appellant maintains that there are significant issues of fact from which a common pleas court jury should determine whether appellee and its employees, following the death of the baby, created a second operative report in an attempt to defeat an informed consent claim by appellant. Appellant notes that a first report, dictated on the day of the surgery, generally describes the surgery; however, after the baby died, the physicians created a second report on March 19, 1997, which included the following paragraph:
The patient also desired permanent and irreversible sterilization. The risks and benefits of the procedure were discussed with the patient including the risk of failure of approximately one in 250 with increased risk of ectopic gestation if pregnancy occurred. Dr. Zurawski discussed with the patient the indications for cesarean section with severe intrauterine growth restriction which carries with it an increased risk of poor fetal outcome including fetal death. The patient stated that she desired permanent and irreversible sterilization regardless of neonatal outcome.
 {¶ 19} Appellant argues that, in creating the second document, appellee was clearly hoping that the first version had been eliminated from the records before appellant obtained copies.
 {¶ 20} Upon review of the evidence presented, we find that the Court of Claims did not err in failing to find that Dr. Hsu acted with malicious purpose, in bad faith, or in a wanton or reckless manner toward appellant. While the evidence in this case indicates that an addendum was made to the initial operative report, there was deposition testimony from Drs. Zurawski and Wegner that provided a reasonable explanation for that subsequent report, as well as evidence that Dr. Hsu had no part in the creation of that document.
 {¶ 21} Specifically, Dr. Zurawski testified that, prior to the surgery, she spoke with appellant about the tubal ligation procedure, and told her that "since the indication for her delivery was that her baby was growing poorly and that we couldn't guarantee that the baby would do well after birth, that she needed to consider her future fertility." (Zurawski Depo., at 15.) Dr. Zurawski recalled that appellant "was adamant about wanting her tubes tied, which is why I felt comfortable proceeding." (Zurawski Depo., at 16-17.)
 {¶ 22} Dr. Wegner, as the junior resident, dictated the operative report on the day of surgery, and Dr. Zurawski subsequently "called Dr. Wegner to ask him to amend it to include my counseling, because that's generally how I do my dictations." (Zurawski Depo., at 25.) According to Dr. Zurawski, she wanted the report amended right after she first read it, "to include the conversation that I had with the patient before her surgery about her desire to have her tubes tied and that the risks were discussed with her." (Zurawski Depo., at 25.) Dr. Zurawski told Dr. Wegner "that it was standard for me to put my counseling in my operative notes and that I thought it was important in this case, because I did have that conversation with her, that it be documented." (Zurawski Depo., at 30.)
 {¶ 23} Dr. Wegner, who dictated the addendum to the original notes on March 19, 1997, corroborated Dr. Zurawski's testimony. Dr. Wegner stated that Dr. Zurawski, after receiving a copy of the operative report, "as an instructional or learning tool to me, explained how she likes to do her operative reports and reiterating informed consent and that type of thing in the operative report." (Wegner Depo., at 54.)
 {¶ 24} Dr. Hsu testified that, because she did not dictate the second operative report, she did not know why it was sent to her to sign. Dr. Hsu further testified that she did not direct anyone to dictate a second report, nor did she ever discuss preparation of an addendum with anyone.
 {¶ 25} In considering the evidence presented, we note that the instant case does not involve the intentional destruction of documents, as is typically asserted with spoliation claims. See Wachtman v. Meijer, Inc.,
Franklin App. No. 03AP-948, 2004-Ohio-6440, at ¶ 28 (noting one Ohio appellate court's observation that, since the Ohio Supreme Court's decision in Smith v. Howard Johnson Co., Inc. (1993), 67 Ohio St.3d 28, recognizing a cause of action in tort for interference with or destruction of evidence, "no court in Ohio * * * has extended spoliation to anything other than the destruction of physical evidence"). Nor does this case involve the failure to produce relevant medical records, potentially giving rise to an inference that such evidence may have been unfavorable to appellee.
 {¶ 26} Here, appellant seeks to raise the inference that Dr. Zurawski's request for an addendum to the medical record was part of a broader scheme by others, including Dr. Hsu, to falsify medical records and to conceal the original report. That original report, however, was not concealed, and appellant's contention that there was a plan or scheme to destroy it after the addendum was created is based upon mere conjecture. Rather, there was evidence before the Court of Claims, if believed, showing that Dr. Hsu: (1) did not have any part in creating the documents at issue, including the addendum; (2) never requested the preparation of a second report; (3) did not discuss with anyone the preparation of a second report; and (4) did not act in bad faith, maliciously, or out of concern of potential litigation when she signed the subsequent report.
 {¶ 27} Because there is evidence to support the Court of Claims' determination that Dr. Hsu did not act with malicious purpose, in bad faith, or in a wanton or reckless manner toward appellant, appellant's first assignment of error is without merit and is overruled.
 {¶ 28} Under the second assignment of error, appellant asserts that the Court of Claims erred in failing to continue the immunity determination until discovery had been completed. Specifically, appellant maintains her counsel requested that the court continue the case until Dr. Hsu or appellee responded to the proposed discovery.
 {¶ 29} In general, the granting or denial of a continuance is left to the broad, sound discretion of the trial court, and such decision will not be reversed absent an abuse of discretion. Fernandez v. Ohio StatePain Control Ctr., Franklin App. No. 03AP-1018, 2004-Ohio-6713, at ¶ 22.
 {¶ 30} A review of the record in this case belies appellant's contention that a continuance was requested. By way of background, at the beginning of the hearing on May 15, 2003, the parties represented that they would not be presenting live testimony, but that they would provide oral arguments. Before going forward, counsel for appellant indicated that he had just received a discovery request that morning. The following colloquy then took place between appellant's counsel and the trial court:
MR. METZ: Your Honor, I think Mr. O'Keefe accurately set forth probably the procedure here this morning. We don't have any live witnesses. There was some discovery that was served, which I just got this morning, so with the permission of everyone, I'll just file that.
THE COURT: In all fairness to you, John, if you want to look at it, if you want me to give you some time to look at it, you know darn well I'll do that. * * *
* * *
THE COURT: Are you ready to argue it or would you like — in all fairness to you, if you just got — would you like to wait for 20 minutes or a half an hour and read the — you know — * * *.
MR. METZ: I think, Your Honor, I — I foresaw this and I called counsel yesterday to see if we should continue it, but the feeling was they wished to go forward.
THE COURT: Okay.
MR. METZ: But I still didn't have it until this morning. And I hate to waste everybody's time, so I think I'm ready to argue this morning if I may be able — I got an evidentiary — or a brief, I don't know what Steve called it, but a brief this morning, which I guess as long as I might have some period of time to write a similar brief back, but I — since we're here, I think we might as well have some oral arguments.
THE COURT: And my point about it, would it be better to give you a half an hour to read the stuff? You tell me. I'm at your pleasure. You know, I mean, I'm going to be here, but I'm willing to give you whatever recess you need.
MR. METZ: Thank you. I — it appears it's just documents, Your Honor, and I did look through them in the last half hour or so or ten minutes —
THE COURT: So you're ready to argue, John?
MR. METZ: I believe so. It doesn't change the argument.
(Tr. 5-7.)
 {¶ 31} The record reveals that, although appellant's counsel received the discovery at issue on the morning of trial, counsel never sought a continuance. To the contrary, as cited above, counsel represented that he had read the materials and was prepared to proceed. Further, the trial court made clear, on the record, that counsel would be afforded additional time to review the materials if necessary. Under these circumstances, appellant has failed to demonstrate any prejudice. Moreover, appellant's failure to request a continuance waives any claim that the trial court erred in not continuing the matter. Douglass-Makniv. Makni, Pike App. No. 01CA680, 2002-Ohio-5098, at ¶ 22.
 {¶ 32} Appellant's second assignment of error is without merit and is overruled.
 {¶ 33} Appellant's argument under her third assignment of error is terse; appellant appears to contend that no "party" to the proceedings ever requested an immunity determination, and, therefore, the Court of Claims erred in granting immunity to Dr. Hsu.
 {¶ 34} However, as noted by appellee, on February 13, 2003, appellant filed a motion specifically requesting a "determination" by the Court of Claims as to "whether Helen W. Hsu, M.D. is entitled to immunity and subject to suit in the Ohio Court of Claims." Further, the record does not support appellant's contention that appellee did not argue in favor of immunity; rather, appellee in fact asserted that appellant failed to show Dr. Hsu acted in a willful, wanton or reckless manner so as to deny her immunity under R.C. 9.86.
 {¶ 35} Appellant's third assignment of error is without merit and is overruled.
 {¶ 36} Under her fourth assignment of error, appellant argues that the Court of Claims erred by placing the burden on her to disprove Dr. Hsu's immunity. Appellant challenges language in the Court of Claims' decision finding that "plaintiff has failed to prove that Dr. Hsu acted with malicious purpose, in bad faith, or in a wanton or reckless manner toward plaintiff."
 {¶ 37} The issue raised by appellant was previously addressed by this court in Fisher v. Univ. of Cincinnati Med. Ctr. (Aug. 25, 1998), Franklin App. No. 98AP-142, in which we held in pertinent part:
Appellant has provided no authority, nor have we found any authority, for the proposition that a state employee, or the state, has the burden to prove that a state employee acted outside the scope of his or her employment. In cases where a claimant is seeking to prove that personal liability should be imposed upon a state employee, it would be illogical to require the employee, or the state, to have the burden of proving that the employee was acting within the scope of his or her employment.
 {¶ 38} Based upon this court's decision in Fisher, appellant's fourth assignment of error is without merit and is overruled.
 {¶ 39} Under the fifth assignment of error, appellant asserts that the Court of Claims erred in failing to find that R.C. 2743.02 and 2743.03
are unconstitutional in that they deny due process and equal protection to litigants. Appellant challenges the unavailability of juries in the Court of Claims, as well as the fact that retired judges, over the age of 70, are permitted to try cases.
 {¶ 40} Those same arguments were raised and rejected by this court inAshcraft v. Univ. of Cincinnati Hosp., Franklin App. No. 02AP-1353, 2003-Ohio-6349. See, also, Conley v. Shearer (1992), 64 Ohio St.3d 284, 292
(right to jury trial is not infringed by the procedure found in R.C.2743.02(F); Fisher, supra. On the basis of the above authorities, appellant's constitutional challenges are not well-taken, and the fifth assignment of error is overruled.
 {¶ 41} Based upon the foregoing, appellant's five assignments of error are overruled, and the judgment of the Ohio Court of Claims is hereby affirmed.
Judgment affirmed.
Petree and Lazarus, JJ., concur.