[Cite as *Zidron v. Metts*, 2017-Ohio-1118.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Amy M. Zidron, D.O., | : | |
| Appellant, | : | |
| v. | : | |
| Bradley Metts, et al., | : | No. 15AP-1049 <br> (Ct. of Cl. No. 2014-00223) |
| Plaintiffs-Appellees, | : | |
| v. | : | (REGULAR CALENDAR) |
| Ohio University Heritage College of <br> Osteopathic Medicine, | : | |
| | : | |
| Defendant-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on March 28, 2017

**On brief:** *Hanna, Campbell & Powell, and Douglas G. Leak; Poling Law Firm,* and *Frederick A. Sewards* for appellant. **Argued:** *Douglas G. Leak.*

**On brief:** *Michael DeWine,* Attorney General, and *Brian M. Kneafsey, Jr.,* for appellee Ohio University Heritage College of Osteopathic Medicine. **Argued:** *Brian M. Kneafsey, Jr.*

APPEAL from the Court of Claims of Ohio

BRUNNER, J.

{¶ 1} Appellant, Amy M. Zidron, D.O. ("Dr. Zidron"), appeals from a judgment of the Court of Claims of Ohio finding that she was not entitled to personal immunity pursuant to R.C. 9.86 and 2743.02. For the reasons that follow, we affirm.

No. 15AP-1049

## I.   FACTS & PROCEDURAL HISTORY

{¶ 2}   On March 7, 2014, plaintiffs-appellees, Bradley Metts ("Bradley"), a minor, and his father, Mark Daniel "Danny" Metts, II ("Danny" and the plaintiffs together, "Metts"), filed a complaint against defendant-appellee, Ohio University Heritage College of Osteopathic Medicine ("OU-HCOM").  Metts asserted a claim for medical negligence, alleging that OU-HCOM and/or OU-HCOM's employees failed to "diagnose and properly treat" Bradley's "significant ear infection" and that this resulted in severe, permanent injury, including "mastoiditis, meningitis, cerebral edema, myocardial infarction, muscle atrophy and immobility, impaired cognition, and incontinence."  (Mar. 7, 2014 Compl. at ¶ 6-7.)  Metts also asserted a claim for loss of consortium.  The Court of Claims entered an order of reference, pursuant to Civ.R. 53, for a magistrate to manage and preside over the case.

{¶ 3}   On August 28, 2014, Metts, already being in the Court of Claims, requested an immunity determination of a doctor who had treated Bradley, Dr. Zidron, pursuant to R.C. 2743.02(F) to decide whether Dr. Zidron was entitled to personal immunity under R.C. 9.86.  Dr. Zidron had asserted personal immunity in a related action captioned *Metts v. Nationwide Children's Hospital,* Franklin C.P. No. 14CV-002543.  The magistrate in the Court of Claims granted Metts' motion and scheduled an evidentiary hearing for February 18, 2015.

{¶ 4}   The facts presented at the hearing demonstrated that Bradley went to the offices of University Medical Associates, Inc. ("UMA") on October 28, 2013 complaining of an earache and a fever.  Bradley's appointment was at 10:45 a.m. and scheduled with Dr. Zidron.  Although Bradley was "[a] patient of the pediatrics group" at UMA, Dr. Zidron had never personally treated Bradley before October 28, 2013.  (Feb. 18, 2015 Hearing Tr. at 85.)  Dr. Zidron was in her fourth month in UMA's employment at that time.

{¶ 5}   UMA is a private, non-profit organization with its own board of directors.  UMA is the exclusive practice group through which OU-HCOM faculty members are permitted to practice medicine.  UMA leases office space from Ohio University.  Dr. Zidron's employment with UMA commenced on July 1, 2013.

{¶ 6}   Dr. Zidron was also employed by OU-HCOM as an assistant professor in the department of pediatrics.  Dr. Zidron's duties as an assistant professor included "active

classroom and laboratory teaching" and "clinical teaching." (Dr. Zidron Ex. 4 at 2, Feb. 18, 2015 Hearing.) Dr. Zidron's employment with OU-HCOM was conditioned on her entering into an employment agreement with UMA. (Dr. Zidron Ex. 4.) Dr. Zidron's employment with OU-HCOM began a month after her employment with UMA on August 1, 2013.

{¶ 7} Dr. Zidron's annual salary from UMA was $123,000; her annual salary from OU-HCOM was $27,000. (OU-HCOM Ex. A, Feb. 18, 2015 Hearing.) OU-HCOM agreed to "reimburse UMA for [Dr. Zidron's] annual clinical salary" for "two consecutive years" beginning "from the UMA clinical practice hire date." (Dr. Zidron Ex. 4 at 1.)

{¶ 8} Dr. Zidron testified that most of her clinical teaching for OU-HCOM occurred at the UMA offices. On October 28, 2013, Dr. Jacqueline Fisher accompanied Dr. Zidron in her rounds at the UMA offices as part of Dr. Fisher's resident physician training. Dr. Fisher was a resident participating in the Centers of Osteopathic Research and Education ("CORE") program. Dr. Zidron testified that residents involved in CORE would "come to UMA as part of their residency program requirements to rotate through and learn their CORE requirement of pediatrics." (Hearing Tr. at 72-73.) Although Dr. Zidron recalled that a resident accompanied her at the UMA offices on October 28, 2013, Dr. Zidron stated that she had "no recollection one way or the other" of whether Dr. Fisher was present in the room during Bradley's appointment. (Hearing Tr. at 53.)

{¶ 9} On June 9, 2015, the magistrate of the Court of Claims issued a decision finding that Dr. Zidron was not entitled to the immunity afforded by R.C. 9.86. The magistrate observed that Dr. Zidron's duties "pursuant to her employment with OU-HCOM included clinical teaching. Dr. Zidron's duties pursuant to her employment with UMA included the clinical practice of medicine." (June 9, 2015 Mag.'s Decision at 5.) The magistrate reviewed the evidence in the record and concluded that Dr. Fisher was not present when Dr. Zidron treated Bradley. As such, the magistrate found that Dr. Zidron was not engaged in clinical teaching when she treated Metts, and she was, therefore, acting manifestly outside the scope of her state employment with OU-HCOM.

{¶ 10} Dr. Zidron filed objections to the magistrate's decision on June 23, 2015. OU-HCOM filed a response to Dr. Zidron's objections on July 6, 2015.

No. 15AP-1049

{¶ 11} On October 14, 2015, the Court of Claims entered judgment overruling Dr. Zidron's objections and adopted the magistrate's decision as its own. Dr. Zidron's first objection was that the magistrate erred by shifting the burden of proof from OU-HCOM to Dr. Zidron. The Court of Claims observed that the magistrate's decision did not mention anything about shifting the burden of proof, and it could find "no evidence to support the assertion that the magistrate incorrectly placed the burden of proof on Dr. Zidron." (Oct. 14, 2015 Decision at 2.) Dr. Zidron's second objection was that the magistrate erred in finding that Dr. Zidron was not acting within the scope of her employment when the alleged malpractice occurred. The Court of Claims stated that Dr. Zidron had testified that she could not recall if Dr. Fisher was present when she treated Bradley and that the electronic medical record demonstrated that Dr. Fisher never accessed Bradley's chart on October 28, 2013. The Court of Claims concluded that there was "more evidence from which the court [could] infer Dr. Zidron was not teaching and therefore not acting within the scope of her employment with OU-HCOM when she treated [Bradley] Metts." (Decision at 7.)

## II. ASSIGNMENTS OF ERROR

> I. The Trial Court Committed Prejudicial Error In Denying Amy Marie Zidron, D.O. Civil Immunity By Applying The Wrong Burden of Proof
>
> II. The Trial Court's Denial Of Civil Immunity For Amy Marie Zidron, D.O. Was Against The Manifest Weight Of the Evidence

{¶ 12} For cogency of analysis, we address Dr. Zidron's second assignment of error first.

## III. SECOND ASSIGNMENT OF ERROR—MANIFEST WEIGHT OF THE EVIDENCE ON CIVIL IMMUNITY

{¶ 13} Dr. Zidron argues in her second assignment of error that the Court of Claims' denial of her defense of immunity was against the manifest weight of the evidence. We disagree.

{¶ 14} As a preliminary matter, Civ.R. 53 governs proceedings before a magistrate, including objections to a magistrate's decision. Civ.R. 53(D)(4)(d) provides that "[i]f one or more objections to a magistrate's decision are timely filed, the court shall rule on those objections." "In reviewing objections to a magistrate's decision, the trial court must make

an independent review of the matters objected to in order 'to ascertain [whether] the magistrate has properly determined the factual issues and appropriately applied the law.' " *Randall v. Eclextions Lofts Condo. Assn.*, 10th Dist. No. 13AP-708, 2014-Ohio-1847, ¶ 7, quoting Civ.R. 53(D)(4)(d). *See also Roe v. Heap*, 10th Dist. No. 03AP-586, 2004-Ohio-2504, ¶ 34, quoting *Nolte v. Nolte*, 60 Ohio App.2d 227 (8th Dist.1978), paragraph two of the syllabus.

{¶ 15} "If objections are filed, a trial court undertakes a de novo review of a magistrate's decision." *Meccon, Inc. v. Univ. of Akron*, 10th Dist. No. 12AP-899, 2013-Ohio-2563, ¶ 15, citing *Mayle v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-541, 2010-Ohio-2774, ¶ 15. " 'However, the appellate standard of review when reviewing a trial court's adoption of a magistrate's decision is an abuse of discretion.' " *Id.* A court of appeals may only reverse a trial court's adoption of a magistrate's decision if the trial court acted unreasonably or in an arbitrary manner. *Id.* As such, an abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Claims of trial court error must be based on the trial court's decision and judgment, as opposed to the magistrate's findings. *Mayle* at ¶ 15.

{¶ 16} "With respect to manifest weight challenges, judgment supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. " *Meccon* at ¶ 15, citing *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-606, 2012-Ohio-1017, ¶ 31, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. "Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed.' " *Caldwell v. Ohio State Univ.*, 10th Dist. No. 01AP-997, 2002-Ohio-2393, ¶ 59, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The appellate court, however, must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. *Id.* Furthermore, "[t]he power to reverse on 'manifest weight' grounds should only be used in exceptional circumstances, when 'the evidence weighs heavily against the [judgment.]' "

No. 15AP-1049

*Id.*, quoting *Thompkins* at 387. *See also Siegel v. State*, 10th Dist. No. 14AP-279, 2015-Ohio-441, ¶ 48.

{¶ 17} A personal immunity determination is governed by the application of R.C. 9.86 and 2743.02(F). R.C. 9.86 provides:

> Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.[1]

The Court of Claims has exclusive, original jurisdiction to determine whether a state employee is personally immune from liability in a civil action under R.C. 9.86 or whether the employee's conduct was manifestly outside the scope of his or her employment at the time the cause of action arose. R.C. 2743.02(F); *Johns v. Univ. of Cincinnati Med. Assocs.*, 101 Ohio St.3d 234, 2004-Ohio-824, ¶ 1, 30. If the Court of Claims determines that the state employee is immune from personal liability, the claimant must assert his or her claims against the state and the state shall be liable for the employee's acts or omissions if a claim is timely filed in the Court of Claims. R.C. 2743.02(A)(2). If the Court of Claims finds that the state employee is not entitled to immunity, the employee will be subject to suit in the court of common pleas. *Conley v. Shearer*, 64 Ohio St.3d 284, 292 (1992).

{¶ 18} The term "scope of employment" is a concept that "denotes an agency relationship in which the agent or employee is engaged in an activity that is logically related to the business of the principal or employer." *Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208, ¶ 15. For purposes of R.C. 9.86 immunity, a state employee acts within the scope of employment if the employee's actions are " 'in furtherance of the interests of the state.' " *Id.*, quoting *Conley* at 287. When a health care practitioner "has dual status as a private practitioner and as an employee of a state

---

[1] There has been no allegation in this case that Dr. Zidron acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

medical institution," R.C. 9.86 immunity attaches only to actions taken while the practitioner "is performing duties for the state." *Theobald* at ¶ 16.

{¶ 19} In *Theobald*, the Supreme Court of Ohio acknowledged that the dual employment status of healthcare practitioners in this state had caused courts to "struggle[] to identify an appropriate analysis of the scope of employment for purposes of personal immunity." *Id.* at ¶ 16. "In early cases, courts analyzed billing procedures and other financial factors" to determine whether the state directly received the financial benefits from the medical services rendered. *Id.* at ¶ 17. *See Katko v. Balcerzak*, 41 Ohio App.3d 375 (10th Dist.1987); *York v. Univ. of Cincinnati Med. Ctr.*, 10th Dist. No. 95API09-1117 (Apr. 23, 1996); *Kaiser v. Flege*, 10th Dist. No. 98AP-146 (Sept. 22, 1998). However, in cases like *Norman v. Ohio State Univ. Hosp.*, 116 Ohio App.3d 69, 77 (10th Dist.1996), and *Ferguson v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 98AP-863 (Jun. 22, 1999), this Court began to expand the analysis and, as described by the Supreme Court in *Theobald*, "to examine the physician's relationship with the patient" and "to place less emphasis on the financial factors." *Theobald* at ¶ 18, 20.

{¶ 20} The *Theobald* court observed that while "financial factors may be relevant to the practitioner's status as a state employee * * * they do not necessarily establish whether he or she was within the scope of that employment at the time a cause of action arose." *Id.* at ¶ 23. The Supreme Court held that "the question of scope of employment must turn on what the practitioner's duties are as a state employee and whether the practitioner was engaged in those duties at the time of an injury." *Id.* Accordingly, "proof of the content of the practitioner's duties is crucial." *Id.*

{¶ 21} So, to determine whether a state employee is entitled to immunity under R.C. 9.86, the Court of Claims in a R.C. 2743.02(F) immunity determination proceeding must initially decide whether the practitioner is a dtate employee. An individual is a state employee, for purposes of R.C. 9.86, if he or she is "employed by the state." R.C. 109.36(A)(1)(a). If the practitioner is not a state employee, no further analysis is needed, and R.C. 9.86 does not endow individual immunity. *See Theobald* at ¶ 30.

{¶ 22} If the practitioner *is* determined to be a state employee, the Court of Claims must then examine the activities of the practitioner in question and determine whether the practitioner was acting on behalf of the state when the patient was alleged to have

been injured. *Id.* at ¶ 31. "If there is evidence that the practitioner's duties include the education of students and residents, the court must determine whether the practitioner was in fact educating a student or resident when the alleged negligence occurred." *Id. See Clevenger v. Univ. of Cincinnati College of Medicine*, 10th Dist. No. 09AP-585, 2010-Ohio-88, ¶ 9 (finding that a doctor was entitled to immunity, as the evidence demonstrated that the doctor "was supervising and educating two separate interns during his treatment of Ms. Clevenger").

{¶ 23} The circumstances of the practitioner at the time are a question of fact, while the question of immunity becomes one of law based on the facts. *Barkan v. Ohio State Univ.*, 10th Dist. No. 02AP-436, 2003-Ohio-985, ¶ 11.

{¶ 24} In Dr. Zidron's case, her offer letter from OU-HCOM clearly conveyed that she was employed by the state as an assistant professor of OU-HCOM's department of pediatrics. (Dr. Zidron's Ex. 4.) *Compare Theobald* at ¶ 30 ("[i]f there is no express contract of employment, the court may require other evidence to substantiate an employment relationship"). Whether Dr. Zidron was acting as a state employee, that is, supervising and educating Dr. Fisher, when she treated Bradley on October 28, 2013, is a question of fact.

{¶ 25} Dr. Zidron's offer letter from OU-HCOM conveyed that her state salary would be based on the "percentage of time you will be committed to College activities (20%) vs. clinical teaching activities (80%)." (Dr. Zidron Ex. 4 at 1.) Dr. Zidron testified that "college activities" encompassed "contact time with medical students directly, so that would be giving lectures for the medical students, facilitating small groups or helping with clinical responsibilities for the first and second years." (Hearing Tr. 46-47.) The "clinical activities" Dr. Zidron was to perform at OU-HCOM included supporting "the distinctive concepts of osteopathic medicine," "meet[ing] the College's goal of producing competent, compassionate physicians for the state of Ohio," and "provid[ing] active classroom and laboratory teaching and leadership for the College's teaching programs, including clinical teaching, and participation in faculty development programs." (Zidron Ex. 4 at 2.)

{¶ 26} Elizabeth Maxon is the chief administrative officer for OU-HCOM. She testified that Dr. Zidron's employment with OU-HCOM was for "teaching only." (Hearing Tr. at 92.) Maxon stated that OU-HCOM had no control over Dr. Zidron's clinical duties.

No. 15AP-1049

(Hearing Tr. at 93.) Based on this evidence, the Court of Claims concluded that Dr. Zidron's duties as a state employee included college activities and clinical teaching.

{¶ 27} Dr. Zidron's employment with OU-HCOM was conditioned on her entering into an employment agreement with UMA. (Dr. Zidron Ex. 4.) Dr. Zidron's annual salary from UMA was $123,000, while her annual salary from OU-HCOM was $27,000. (OU-HCOM Ex. A.) OU-HCOM agreed to "reimburse UMA for [Dr. Zidron's] annual clinical salary" for "two consecutive years" beginning "from the UMA clinical practice hire date" which was July 1, 2013. (Dr. Zidron Ex. 4 at 1.) It may be tempting to conflate the university's 20/80 ratio of college teaching to clinical teaching with the salary split between OU-HCOM and Dr. Zidron's activities with UMA (some of which was clinical teaching when accompanied by a student or resident). But nothing in the record supports this. Comparing the 20/80 ratio of college/clinical teaching activities for OU-HCOM with her salary split, Dr. Zidron's overall $150,000 in annual income was not in the same proportion, with an 18/82 income split between each OH-HCOM and UMA.

{¶ 28} UMA's separate employment agreement required Dr. Zidron "render medical and surgical services for UMA," to keep and maintain "appropriate records relating to all professional services rendered," and to prepare reports and correspondence that would "belong to UMA." (Dr. Zidron Ex. 1 at 1.) UMA scheduled patients for Dr. Zidron, and UMA billed Dr. Zidron's patients for her services. UMA required Dr. Zidron to be "on call" and to be available to work nights, weekends, and holidays. (Dr. Zidron Ex. 1 at 1.) UMA supplied Dr. Zidron with a medical office, facilities, equipment, and supplies and provided her with nursing, secretarial, and administrative staff. UMA also provided Dr. Zidron with fringe benefits, such as health insurance and a pension, and UMA paid for Dr. Zidron's medical malpractice insurance. (Dr. Zidron Ex. 1.) Even though OU-HCOM required Dr. Zidron to enter into an employment agreement with UMA, it was UMA that controlled Dr. Zidron's clinical practice of medicine. It was only when she was accompanied at UMA by an OU-HCOM student or resident could it be said that Dr. Zidron was engaged in clinical teaching. Otherwise, when she rendered service to patients at UMA, she was simply engaged in clinical practice.

{¶ 29} Accordingly, based on Dr. Zidron's testimony, the Court of Claims found that Dr. Zidron was not engaged in clinical teaching when she treated Bradley on

No. 15AP-1049

October 28, 2013, because Dr. Fisher was not with her. Dr. Zidron's rendering of services to Bradley on October 28, 2013 was simply the private practice of medicine and was manifestly outside the scope of her state employment. *Compare Ries v. Ohio State Univ. Med. Ctr.*, 137 Ohio St.3d 151, 2013-Ohio-4545, ¶ 3, 8, 31 (although the patient's records did not "indicate the presence of a student or resident" during the patient's treatment because the doctor's "duties *as a state employee* included providing clinical care to patients, whether or not he was actively engaged in teaching at that time," the doctor acted within the scope of his state employment by treating the patient at the university clinic). (Emphasis added.)

{¶ 30} Dr. Zidron testified that on a "typical day" when Dr. Zidron was engaged in the clinical teaching of residents, she would have the resident "go in and see [her] patients before [she went] in the room." (Hearing Tr. at 50.) The resident would "take the history, do a physical exam, come out and present their findings to [Dr. Zidron] and then [] determine an assessment [of] what they think is wrong and a plan, a course of action." (Hearing Tr. at 50.) Dr. Zidron stated that "[i]deally" the resident would "see all [her] patients before [she does]." (Hearing Tr. at 50.) Dr. Zidron testified that when the resident went in and saw the patient first, the resident would access the patient's chart and document the results of the physical exam in the chart. (Hearing Tr. at 51.) Dr. Zidron admitted that this normal course of practice was not followed with respect to Bradley on October 28, 2013. (Hearing Tr. at 75.)

{¶ 31} The electronic medical record from October 28, 2013 demonstrates that Dr. Fisher did not write anything in Bradley's chart and did not "access [Bradley's] chart[]" in any way that day. (Hearing Tr. at 21-22.) Dr. Zidron had 26 patients scheduled for October 28, 2013, and the record demonstrates that Dr. Fisher accessed the charts of 11 of those 26 patients. (Hearing Tr. at 18; Dr. Zidron Ex. 2.)

{¶ 32} Dr. Zidron testified that "there are circumstances" where, due to "time constraints," she and the resident "go to a patient room together, and then we will do the history and physical exam * * * together." (Hearing Tr. at 50, 76.) In these circumstances, Dr. Zidron stated that she would "typically do the charting at that point," and the resident would not access or otherwise document anything in the patient's chart. (Hearing Tr. at 51.) Dr. Zidron stated that if a resident was merely present in the room,

No. 15AP-1049

Dr. Zidron would not note that fact in the patient's chart. (Hearing Tr. at 74.) Dr. Zidron testified that when she had a resident, it was her typical practice to have the resident present with her for every patient she saw that day. (Hearing Tr. at 74.)

{¶ 33} Dr. Zidron confirmed that she saw and treated Bradley on October 28, 2013. She stated that Dr. Fisher was with her at the UMA offices on October 28, 2013. However, Dr. Zidron testified that she had "no recollection one way or the other" of whether Dr. Fisher was with her when she treated Bradley. (Hearing Tr. at 53.) Dr. Zidron admitted that she did not have any information, recollection, or documentation to support a finding that Dr. Fisher was present when she treated Bradley. And Dr. Zidron stated there are patients at UMA she sees when not accompanied by a resident or student; she agreed that if she saw a patient without being accompanied by a resident or a student, she was not engaged in clinical teaching.

{¶ 34} Bradley's appointment with Dr. Zidron was scheduled for 10:45-11:00 a.m. (Dr. Zidron Ex. 2 at 1.) Dr. Zidron had no activity or appointment scheduled from 10:30-10:45 a.m., and she had a lunch break scheduled from 11:30 a.m. to 1:00 p.m. (Dr. Zidron Exhibit 2.) Dr. Zidron stated that she "never run[s] on time" for a scheduled appointment, explaining that she could be anywhere from 20 minutes to one hour behind schedule. (Hearing Tr. at 78, 80.) Bradley's chart indicates that a nurse measured and recorded his vital signs at 10:53 a.m. on October 28, 2013. (OU-HCOM Ex. G.) When she reviewed Bradley's chart as part of her testimony, Dr. Zidron confirmed that it "could still be some time" after 10:53 a.m. that she would have arrived in the examining room where Bradley was present. (Hearing Tr. at 87.)

{¶ 35} The electronic medical record indicates that Dr. Fisher was accessing charts of other patients that morning and early afternoon, specifically at 10:46 a.m., 10:48, 10:52, 11:07, 11:08, 11:22, 11:25, 11:28, 11:35, 11:36, 11:38, 11:40 11:42, 11:43, 11:44, 11:45, 11:46, 12:00 p.m., and 12:01. (Dr. Zidron Ex. 3.) After 12:01 p.m., Dr. Fisher did not resume accessing until after 1:00 p.m. (Dr. Zidron Ex. 3.) When she reviewed the electronic medical record as part of her testimony, Dr. Zidron confirmed that Dr. Fisher would have been seeing other patients at the times listed in the record. There is nothing in Bradley's chart that would lead to an inference that Dr. Fisher was ever involved in his treatment that day. (OU-HCOM Ex. G.)

No. 15AP-1049

{¶ 36} Reviewing the totality of the evidence, we do not find that the evidence weighs heavily against the judgment of the Court of Claims. Dr. Zidron argues that "[w]hile the record did indicate that Dr. Fisher had accessed the charts for Dr. Zidron's other patients, this did not indicate that Dr. Fisher was not present for Bradley Metts' appointment." (Jan. 19, 2016 Appellant's Brief at 20.) To the contrary, however, Dr. Zidron could not recall if Dr. Fisher was actually present for Bradley's appointment. The electronic medical record provided the Court of Claims with circumstantial evidence that Dr. Fisher was not present for the appointment. *See State v. Nicely*, 39 Ohio St.3d 147 (1988), quoting *Black's Law Dictionary*, 221 (5th Ed.1979) (stating that "[c]ircumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved' "). " 'Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof.' " *State v. Heer*, 10th Dist. No. 97APA12-1670 (Sep. 24, 1998), quoting *State v. Biros*, 78 Ohio St.3d 426, 447 (1997). The electronic medical record, circumstantial evidence, demonstrated that Dr. Fisher was seeing patients other than Bradley around his appointment time with Dr. Zidron.

{¶ 37} Dr. Zidron basically argues that her direct testimony about her normal course of practice to have a resident present with her for every patient she saw is superior to the evidence in the electronic medical record. Dr. Zidron argues that her testimony was sufficient to establish that Dr. Fisher was present for Bradley's appointment. But Evid.R. 406, that "[e]vidence of the habit of a person * * * is relevant to prove that the conduct of the person * * * on a particular occasion was in conformity with the habit or routine practice," relates to relevance and not to either weight of the evidence. Weighing the evidence was within the province of the trier of fact, the Court of Claims. Evidence of habit may "tend to prove one acted in the particular case in the same manner," but it does not conclusively establish that one acted in conformity with his or her habit. *Cardinal v. Family Foot Care Centers, Inc.*, 40 Ohio App.3d 181, 182 (8th Dist.1987), paragraph two of the syllabus. *See State v. Gaines*, 8th Dist. No. 82301, 2003-Ohio-6855, ¶ 28 (habit evidence demonstrates "probability rather than certitude"). The magistrate permitted Dr. Zidron to testify regarding her usual course of practice, but the magistrate concluded that

No. 15AP-1049

other, contradictory evidence based on the electronic medical record was of greater weight. And while Dr. Zidron asserts that the magistrate and the Court of Claims "completely ignored" her testimony regarding her usual course of practice, the record shows that the magistrate acknowledged Dr. Zidron's habit evidence but found the electronic record evidence to be more convincing or reliable so as to carry more weight. (Appellant's Brief at 24.) The magistrate ultimately determined the facts to be that "the electronic medical record shows that Dr. Zidron treated [Bradley] Metts without the assistance of a resident." (Mag.'s Decision at 6.) *Accord Barkan* at ¶ 11.

{¶ 38} The Court of Claims overruled Dr. Zidron's objection to the magistrate's decision that the "magistrate erred in failing to consider the common practice, or habit evidence, from [Dr. Zidron's] testimony." (Decision at 5.) In doing so, it acknowledged Dr. Zidron's testimony to this effect. But the Court of Claims observed that unlike in *Schultz v. Univ. of Cincinnati College of Med.*, 10th Dist. No. 09AP-900, 2010-Ohio-2071, there was no physical "evidence in this case that Dr. Fisher was present while Dr. Zidron treated [Bradley] Metts." (Decision at 4-5.) The Court of Claims concluded that the magistrate had "acknowledged the testimony related to Dr. Zidron's habit" but found that there was "more evidence, albeit circumstantial, which demonstrates that Dr. Fisher was not present with Dr. Zidron while she treated [Bradley] Metts nor did she even access his charts." (Decision at 5.)

{¶ 39} In *Schultz*, the doctor testified that "his usual course of practice was to instruct neurosurgical residents in performing various procedures during surgery." *Schultz* at ¶ 26. Although the doctor could not "expressly recall Schultz's surgery, the 'Record of Operation' completed by the circulating nurse during surgery indicated that one of his neurosurgery residents, Dr. Kikkino, was present." *Id.* The doctor testified that "since Dr. Kikkino was listed on the 'Record of Operation' as the attending neurosurgical resident, he would have provided this same type of instruction to Dr. Kikkino during Schulz's surgery." *Id.* Presented with such evidence, this Court found that the record supported the "conclusion that [the doctor was] entitled to personal immunity." *Id.* at ¶ 27. *See also Breidenbach v. Wright State Univ. Boonshoft School of Medicine*, Ct. of Cl. No. 2011-09985, 2012-Ohio-6330, ¶ 10-12; *Porter v. Univ. of Cincinnati*, Ct. of Claims

No. 2009-05714, 2010-Ohio-5909, ¶ 21 (there must be "some evidence documenting that the teaching experience occurred").

{¶ 40} No evidence such as the Record of Operation in *Schultz* supports a finding that Dr. Zidron adhered to her usual course of practice with Dr. Fisher for Bradley's appointment. The magistrate was in the best position to judge the demeanor and the credibility of the witnesses because she actually was present during the testimony at the R.C. 2743.02(F) proceeding. The Court of Claims, thereafter, undertook its "independent review as to the objected matters to ascertain that the magistrate [had] properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d). Being mindful that we review the actions of the Court of Claims according to an abuse of discretion standard, we find no error in the court's conclusion that Dr. Zidron's habit evidence did not establish that she acted in conformity with that habit on October 28, 2013.

{¶ 41} Because the Court of Claims factually found that Dr. Fisher was not present to receive clinical instruction when Dr. Zidron rendered care to Bradley on October 28, 2013, as a matter of law, Dr. Zidron was not engaged in clinical teaching when she treated Bradley on that day. The record contains competent and credible evidence to support the finding that Dr. Zidron was acting manifestly outside the scope of her state employment when she treated Bradley. We find no abuse of discretion in the Court of Claims' adopting the magistrate's decision that Dr. Zidron was not entitled to immunity under R.C. 9.86 and 2743.02(F) when she treated Bradley on October 28, 2013.

{¶ 42} Dr. Zidron's second assignment of error is overruled.

## IV. FIRST ASSIGNMENT OF ERROR—BURDEN OF PROOF

{¶ 43} Dr. Zidron argues in her first assignment of error that the Court of Claims applied the wrong burden of proof. Dr. Zidron states that "[w]ith respect to the burden of proof in determining whether a state employee was acting within the scope of his/her employment, the burden of proof lies with the party seeking to prove that there should not be any civil immunity." (Appellant's Brief at 16.) We agree.

{¶ 44} This Court has held that the plaintiff in a medical malpractice action against the state has the burden to prove that a state employee is not entitled to the immunity afforded under R.C. 9.86. *Siegel* at ¶ 13; *Botkin v. Univ. of Cincinnati College of Medicine*, 10th Dist. No. 04AP-228, 2005-Ohio-1122, ¶ 37; *Fisher v. Univ. of Cincinnati*

*Med. Ctr.*, 10th Dist. No. 98AP-142 (Aug. 25, 1998). *See also Lewis v. Cleveland State Univ.*, Ct. of Cl. No. 2006-07457, 2010-Ohio-2654, ¶ 23 (the "[p]laintiff bears the burden of proving that a state employee should be stripped of immunity").

{¶ 45} In *Fisher*, the plaintiff brought the action in the Court of Claims "seeking a determination that Dr. Mullen [was] not entitled to statutory immunity." *Id.* On appeal, the plaintiff argued that the Court of Claims "prejudiced her and violated her due process rights by placing the burden on her to show that Dr. Mullen was not immune." *Id.* We held that "[i]n cases where a claimant is seeking to prove that personal liability should be imposed upon a state employee, it would be illogical to require the employee, or the state, to have the burden of proving that the employee was acting within the scope of his or her employment." *Id.*

{¶ 46} In *Johns*, the Supreme Court held that because the state is the only defendant in the Court of Claims, a state employee cannot be a party to an immunity determination proceeding. *Id.* at ¶ 31. *See also* R.C. 2743.02(E) ("The only defendant in original actions in the court of claims is the state."). After *Fisher* and in response to *Johns*, the General Assembly amended R.C. 2743.02(F), effective November 3, 2005, to permit state employees to participate in immunity determination proceedings (an "officer or employee may participate in the immunity determination proceeding before the court of claims"). *See also Marotto v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-27, 2012-Ohio-1078, ¶ 4.

{¶ 47} While it was Metts who filed the motion seeking the Court of Claims' immunity determination, Metts did not participate in the hearing. Rather, the only parties at the hearing were OU-HCOM and Dr. Zidron. OU-HCOM argued that Dr. Zidron was not entitled to immunity, advancing the position that would be held by Metts in the proceeding and assuming Metts' burden as to state employee immunity entitlement.

{¶ 48} The Court of Claims acknowledged that the "burden of proof rests with the party seeking to disprove a physician's immunity," i.e., OU-HCOM in this action. (Decision at 2.) The court then quoted *Botkin* quoting *Fisher* and stated it could find no "authority that stands for the proposition that the burden of proof ever lies with the state in determining immunity issues pursuant to R.C. 9.86." (Decision at 2.) While the Court

of Claims omitted acknowledging that OU-HCOM had assumed the burden of proof, just because the state did so is not reversible error. The shifting of the burden was not to Dr. Zidron; it was to the state. The state shouldered Metts' burden, presumably to avoid its own liability pursuant to R.C. 2743.02(E) and (F), since it can be the only defendant in an action before the Court of Claims. R.C. 2743.02(E). Dr. Zidron's assertion that the magistrate and the Court of Claims "held that Dr. Zidron failed to prove that she was furthering the state's interest and acting within the scope of her employment when she cared and treated Bradley Metts" is unsupported by the record. In fact, the Court of Claims in its decision said just the opposite. (Appellant's Brief at 17.) The Court of Claims observed:

> [The] magistrate's decision does not mention a shifting of the burden of proof from defendant to Dr. Zidron. In fact, the decision does not mention the burden of proof at all. It certainly does not state that Dr. Zidron failed to meet her burden of proof.

(Decision at 2.) The Court of Claims observed that the magistrate had found that the "evidence before the court showed that Dr. Zidron was without a resident at the time she treated plaintiff, Bradley Metts, and was therefore not performing her clinical teaching duties on behalf of the state when she treated him." (Decision at 2.) The Court of Claims found no evidence to support the assertion that the magistrate had placed the burden of proof on Dr. Zidron.

{¶ 49} We similarly find no evidence to support Dr. Zidron's argument that the magistrate or the Court of Claims placed the burden of proof on her. Rather, the Court of Claims adopted the magistrate's conclusion that the evidence from the hearing demonstrated that Dr. Zidron was not engaged in clinical teaching when she treated Bradley on October 28, 2013, and that she was, therefore, acting manifestly outside the scope of her state employment.

{¶ 50} Dr. Zidron's first assignment of error is overruled.

No. 15AP-1049

## V. CONCLUSION

{¶ 51} Having overruled Dr. Zidron's first and second assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

SADLER and DORRIAN, JJ., concur.

———————————